SEYMOUR KESSLER, Plaintiff-Appellant, v. PAMELA ZEKMAN *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—91—1963

Opinion filed July 27, 1993.

Beckett, Crewell & Kelso, P.C., of Urbana (Thomas R. Kelso and Carol A. Dison, of counsel), for appellant.

Jenner & Block, of Chicago (Linda L. Listrom and Debbie L. Moeckler, of counsel), for appellees Pamela Zekman and CBS, Inc.

Sweeney & Riman, Ltd., of Chicago (Georgene M. Wilson, of counsel), for appellees Jared E. Frankel and Robert Turf.

McDermott, Will & Emery, of Chicago (Richard L. Sandler and Anne R. Pramaggiore, of counsel), for appellee Charles L. Jones.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff Seymour Kessler, a former podiatrist, filed a complaint in the circuit court wherein he alleged that he was defamed by false statements made by defendant Pamela Zekman, an investigative reporter for WBBM-TV, the wholly owned Chicago affiliate of defendant CBS, Inc., and by defendants Drs. Turf, Frankel, and Jones, who were interviewed by Zekman in a two-part report televised by WBBM-TV. He further claimed that the report tortiously invaded his privacy by placing him in a false light. The statements concerned his practice of podiatry and whether his negligence injured former patients.

Defendants brought a motion for summary judgment, contending that plaintiff, as a "limited public figure," must prove that they misspoke with knowledge that their statements were false or with a reckless disregard for their truth or falsity, and since there was no evidence in the record before the court which tended to show that any of them harbored such knowledge or were guilty of such recklessness, there existed no genuine issue of material fact in the case. The circuit court granted the motion. Plaintiff appeals from that judgment, urging reversal on the following grounds: (1) that the court erred when it determined that the United States Supreme Court's "actual malice" standard applied to the allegedly false statements made and/or aired by defendants; and alternatively (2) that the court erroneously concluded that there was no genuine issue of fact as to whether defend-

ants acted with actual malice. We disagree with both contentions and, accordingly, affirm.

In 1984, plaintiff filed a 10-count complaint in the circuit court of Cook County naming nine podiatrists, including defendants Frankel and Jones, alleging that they had violated various provisions of the Illinois Antitrust Act (Ill. Rev. Stat. 1983, ch. 38, par. 60—1 *et seq.*), the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1983, ch. 121½, pars. 261 through 272), and the Illinois Uniform Deceptive Practices Act (Ill. Rev. Stat. 1983, ch. 121½, pars. 311 through 317). It also alleged that the doctors committed the common law torts of commercial disparagement, unfair competition and interference with prospective economic advantage.

Plaintiff's action grew out of a controversy which raged among the practitioners of podiatric medicine. Plaintiff was the self-described "pioneer" of ambulatory or minimal incision foot surgery (MIS). By using MIS, he claimed that podiatrists could perform a good many surgical procedures in their offices, thus saving the patient the added expense of extensive post-operative hospitalization which accompanied the traditional approach of in-patient surgery. The defendants in that case were traditional-technique podiatrists who used large incisions in order to treat foot ailments and who, according to plaintiff, feared MIS because it and its advocates, the principal one of whom was plaintiff, threatened the future economic viability of traditional podiatric methods. Plaintiff alleged that the defendants began a concerted attack on MIS in professional circles and lobbied to ensure that MIS practitioners could not become fully accredited members or diplomates of the American Podiatry Association (APA). They also purportedly conspired to dissuade insurers, hospitals and governmental agencies from recognizing podiatrists who were not diplomates of the APA. Plaintiff further asserted that the defendants created a scheme to foment litigation against him and other podiatrists who used MIS whereby former patients would file spurious medical malpractice actions in which defendants would voluntarily serve as experts, testifying that the mere use of MIS was *per se* malpractice, all the while knowing the falsity of those assertions. He alleged that he had been a victim of this scheme on many past occasions and that many of the malpractice claims then pending against him were the fruit of this conspiracy.

While the parties underwent discovery in the action, in early July 1984, WBBM-TV televised a two-part report, entitled "The Walking Wounded," which was investigated, composed and narrated by Zekman. Prior to the broadcasts, CBS had aired four commercials

promoting the broadcasts. The tenor of these ads was that a successful Chicago-area podiatrist was injuring his patients with a controversial new procedure and yet State regulators did nothing to prevent this malpractice. Before the Zekman piece aired, the in-studio anchor, Harry Porterfield, introduced it by stating:

"A controversial method of performing foot surgery is sweeping the country. It's never undergone rigorous scientific evaluation. But the surgery is being used nationally by 2,000 foot doctors. Many of them were trained by the Chicago podiatrist who developed the technique. Well[,] tonight Pam Zekman and the Channel Two Investigative Team look at some of the deserving [sic] results of his surgery. Surgery that has turned some patients into The Walking Wounded."

In the report itself, Zekman began by describing plaintiff as a successful Chicago-area foot doctor who claimed to have perfected a new, cheaper and less painful means to alleviate many commonplace foot maladies. She went on to state that in her investigation she spoke to many former patients who were pleased with plaintiff's work and she advised of the plentiful and favorable publicity generated by MIS and the financial success of plaintiff's clinics, while at the same time contrasting those publicized successes with failures which were not as generally well known.

Zekman disclosed that at the time of the report there were over 60 lawsuits pending which charged plaintiff with negligence, use of improper surgical techniques and the performance of unneeded procedures. The report then went into depth with regard to the complaints registered by four of the plaintiffs in those lawsuits. The first one interviewed alleged that plaintiff overcharged her approximately $5,000 for the removal of two bunions; and a podiatrist at the Mayo Clinic, after viewing X rays of the foot, opined that because at the outset the patient needed to have only two toes straightened, the surgery on all 10 toes as performed by plaintiff was "excessive."

The patient also complained that the method plaintiff employed to ensure that the bones healed properly was ineffective. Unlike the podiatrist who would use the conventional method of inserting surgical screws and pins or employing a plaster cast to ensure that the bones which had been cut mended together correctly, plaintiff bound the treated foot using only tape, bandages and a wooden-soled shoe. Defendant Jones stated in the program that this method of healing could lead to deformed growth of the bones, leaving patients with more severe foot injuries than they had before the procedure was employed. Another former patient described how after she saw plaintiff

for removal of a bunion on the sole of her left foot, he convinced her to have the procedure on her right one as well, and that her toes healed by curling upward, destroying the arch of that foot. Zekman reported that the experts who were consulted estimated that the excessive surgery doubled the patient's costs to $3,500.

The report then focused on another of plaintiff's former patients who was shown, in obvious pain, limping bare-footed around her workplace. Her toes pointed at nearly a 45 degree angle from the ground. She said that she went to plaintiff for treatment of calluses and bunions, and that after he operated on nine of her toes, at a cost of $4,400, she could no longer flex her big toes because their joints had been destroyed. She concluded the interview by expressing embarrassment at the way she was forced to walk because of plaintiff's procedure. Defendant Frankel, who treated this patient after plaintiff had performed the operation, stated that "I think the surgery on Mrs. Thompson, ah, essentially was indiscriminately performed." He later said "There is no way as far as I'm concerned that her foot can be restored to what it was prior to the surgery. Because essentially what has occurred is, ah, the foot has been destroyed."

A fourth woman related how she had seen plaintiff for treatment of what he had diagnosed as a neuroma, or a benign nerve tumor, which he found between two bones. Zekman stated that experts told her that the normal treatment of a neuroma is an excision of the tumor, but plaintiff's prognosis was not to remove the tumor but to relieve all pressure on it by repositioning the bones with which it came into contact. Plaintiff surgically altered the position of 10 bones of the foot, and billed the patient approximately $5,500 for the procedure. The patient incurred further expense when, after plaintiff's efforts did not alleviate the pain, the foot required additional surgery. Defendant Turf was asked to comment on plaintiff's means of treating a neuroma, to which he responded:

> "In all the annals of orthopedics and all the literature everywhere[,] in common sense and good care and quality surgery and quality medicine there has never been anyone that stated that all the metatarsals had to be broken to cure a neuroma. No, [the patient] did not have to have it done."

He concluded "I find it abhorrent. I find it ah *** indefensible."

Zekman then informed her audience that plaintiff would not discuss the alleged malpractice disclosed in the report on advice of his attorneys, but he did deny doing unnecessary surgeries, contending that he had more patients now than he could handle. Plaintiff continued by stating that with MIS, complications are lessened because the

invasion on the body is less severe, but that generally, any complications which did occur were rooted in his patients' neglect while following his post-operative directions. He claimed that most of the 60 pending lawsuits were instigated by conspiratorial hospital-based podiatrists who stood to lose their lucrative practices if MIS gained wide acceptance among patients.

The second part of "The Walking Wounded," which was aired on July 9, 1984, began by informing that the Illinois Department of Public Health (Department) was charged with the responsibility of regulating outpatient surgical centers such as those run by plaintiff. The report accused the Department of being remiss in its duties to ensure that only centers which comport with the statutory requirements continue to operate. It suggested that plaintiff's clinic was not in compliance with State law, and that if the Department had ensured compliance, one former patient of plaintiff would not have suffered from the infection which resulted in her incurring nearly $38,000 in medical expenses to cure it. Defendant Dr. Jones was of the opinion that the infection progressed as rapidly as it did because it was not treated effectively and that he felt sure that "the doctor [who cared for the patient] did not know what he was doing."

On October 12, 1984, plaintiff amended his still-pending complaint against the nine podiatrists to include defendants Zekman and CBS, Inc., alleging that their broadcast defamed him and invaded his privacy. He also added Dr. Turf as a defendant, asserting the same torts, and amended his complaint against Doctors Frankel and Jones to include defamation and false light counts against them as well. After a variety of pretrial proceedings which are not salient to the issues on appeal, only the current defendants were named in plaintiff's fourth amended complaint.

Defendants moved for summary judgment and supported their motion with affidavits maintaining that plaintiff could not establish that they had acted with "actual malice." In Zekman's affidavit, she detailed all the information upon which she had formed her belief that the statements she made concerning plaintiff were true. The doctors' affidavits all avowed that any statements made on the broadcast were based on their firsthand knowledge; that what they stated on the air was the product of their best professional judgment; and that when they made the statements, they believed them to be true. Plaintiff filed briefs in opposition to the motion for summary judgment, but offered no counteraffidavits denying or in any way controverting the factual claims presented in defendants' affidavits.

Both at oral argument in the circuit court and in his various memoranda in opposition to defendants' motion for summary judgment, plaintiff never raised or discussed whether there remained a genuine issue of material fact on the existence of actual malice. Instead, he argued only the legal point that since he was not a "limited public figure" for the purpose of the statements in the broadcast, the applicable quantum of fault he must show to prevail in the action was mere negligence. The court rejected this argument, finding a sufficient nexus between the allegedly defamatory statements and the controversy surrounding MIS in which plaintiff was an admitted public figure to warrant the imposition of the actual malice standard. The court further found insufficient evidence to create an issue of fact on actual malice; consequently, it found that summary judgment in favor of all defendants and on all counts of the fourth amended complaint was appropriate, and it entered a final judgment on May 23, 1991. Plaintiff filed a timely notice of appeal from that judgment.

## I

The first issue before us concerns whether the trial court correctly determined that before he would be entitled to recover for any alleged injury to his good name, plaintiff must plead and ultimately prove that defendants acted with "actual malice" toward him. In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, the United States Supreme Court, in order to remove the inhibitory effect of defamation laws, created a constitutional privilege for good-faith critics of government officials.

> "The constitutional guarantees require *** a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80, 11 L. Ed. 2d at 706, 84 S. Ct. at 726.

In *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker* (1967), reported together at 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, the Court extended the *New York Times'* doctrine to those persons it characterized as "public figures" after recognizing that some individuals, while not in the public employ, are nonetheless "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." (*Butts*, 388 U.S. at 164, 18 L. Ed. 2d at 1116, 87 S. Ct. at 1996 (Warren, C.J., concurring). There was no majority opinion.) Chief

Justice Warren reasoned that the *New York Times'* standard should apply to this new category of persons simply because they are not subject to the restraints of the political process—"public opinion may be the only instrument by which society can attempt to influence their conduct." (*Butts*, 388 U.S. at 164, 18 L. Ed. 2d at 1116, 87 S. Ct. at 1996 (Warren, C.J., concurring).) The variegated nature of the group whom the Court intended to recognize as "public figures" is illustrated by the fact that Walker, who was allegedly defamed by the Associated Press, was a retired Army general, while Butts, who complained of being libeled by the Curtis Publishing Company, was the athletic director of the University of Georgia, a State university, but was employed by the Georgia Athletic Association, a private corporation.

Later, in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, the Court addressed an attempt to extend the first amendment protections of *New York Times* to all allegedly defamatory statements which addressed matters of public concern regardless of the status of the person allegedly defamed. It rejected this view of the privilege, holding instead that the subject matter of the comments is not to be the sole inquiry in determining whether a statement merits the protection of the "actual malice" standard. Rather, it applies only where the plaintiff, by virtue of his voluntary conduct, "assume[s] [a] role[ ] of especial prominence in the affairs of society *** [which] invite[s] attention and comment." (*Gertz*, 418 U.S. at 345, 41 L. Ed. 2d at 808, 94 S. Ct. at 3010.) Accordingly, a person may become a public figure for a limited range of issues if he "voluntarily injects himself or is drawn into a particular public controversy." (*Gertz*, 418 U.S. at 351, 41 L. Ed. 2d at 812, 94 S. Ct. at 3013.) Such a person, the *Gertz* Court reasoned, resembles a public official in that he typically enjoys "significantly greater access to the channels of effective communication" and knowingly "runs the risk of closer public scrutiny" than would have been true had he remained in private life. *Gertz*, 418 U.S. at 344, 41 L. Ed. 2d at 808, 94 S. Ct. at 3009.

■ The *Gertz* Court subdivided the "public figure" category identified in *Butts* into two types: general purpose and limited purpose public figures. One who falls within the former category was to be treated as though he were a public official and would be required to establish "actual malice" in order to prevail in any action wherein he asserts that he was defamed. Individuals who come within the second classification are those who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." (*Gertz*, 418 U.S. at 345, 41 L. Ed. 2d at 808, 94

S. Ct. at 3009.) This latter group need establish actual malice only in those instances where the purported libelous statements were sufficiently connected to controversies in which they have chosen to accept a leadership role, and if unrelated to those issues, these limited public figures are to be treated like the private citizen and may recover for defamatory falsehoods which were negligently made.

In the case at bar, plaintiff conceded that he was a limited purpose public figure in the ongoing controversy surrounding the use of MIS. He argues, however, that the court erred in holding him to the "actual malice" standard because the purported defamatory statements were unrelated to his role in that controversy. Thus, the argument continues, since defendants were not constitutionally privileged, he need establish simple negligence in order to prevail. The *Gertz* Court did not describe in detail how closely intertwined an alleged defamatory statement maligning a limited public figure must be to the controversy he has entered before it merits *New York Times* protection. It merely opined that the determination turns on "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz*, 418 U.S. at 352, 41 L. Ed. 2d at 812, 94 S. Ct. at 3013.

In what is universally regarded as the benchmark decision in the application of the rule in *Gertz*, the court in *Waldbaum v. Fairchild Publications, Inc.* (D.C. Cir. 1980), 627 F.2d 1287, *cert. denied* (1980), 449 U.S. 898, 66 L. Ed. 2d 128, 101 S. Ct. 266, provided an analytical schema in resolving the legal question of whether a supposedly defamatory statement concerning a limited public figure is sufficiently related to the controversy in which the party has exposed himself to public scrutiny in order to warrant the implementation of the "actual malice" standard. The *Waldbaum* court set forth a three-step test as a means of guiding a trial court's inquiry in such an instance. The parties here agree that the circuit court was correct when it found *Waldbaum* instructive in deciding plaintiff's status and the degree of fault he need prove to establish his right to recover for the defamation. They disagree only over whether the result it reached comports with the logic of the opinion.

Under the first step, the court must isolate the actual controversy and the extent into which plaintiff has placed himself. As the Court of Appeals for the D.C. Circuit explained in a later case applying *Waldbaum*, "the scope of the controversy into which plaintiff involves himself defines the scope of the public personality." (*Tavoulareas v. Piro* (D.C. Cir. 1987), 817 F.2d 762, 772, *cert. denied* (1987), 484 U.S. 870, 98 L. Ed. 2d 151, 108 S. Ct. 200.) Second, the court is to look to the

plaintiff's role in the controversy to ensure that he actually has a meaningful part in the debate surrounding it. If the plaintiff's role is what the *Waldbaum* court characterized as "trivial or tangential," he is not a public figure for the purposes of that particular public issue. (*Waldbaum*, 627 F.2d at 1297.) Here, plaintiff admitted in the trial court and reaffirms on appeal that he was a public figure for the purposes of the controversy raging over minimal incision surgery to treat problems of the foot. He also grants that he is the central advocate of the procedure. Indeed, in a deposition, he referred to himself as the "major general" in "the war over MIS." Accordingly, since plaintiff asserts no error as to the circuit court's findings relating to the first two ingredients of the formula advanced in *Waldbaum*, we consider only the last element.

*Waldbaum* explained the final part of its test as follows:

> "Finally, the alleged defamation must have been germane to plaintiff's participation in the controversy. His talents, education, experience and motives could have been relevant to the public's decision to listen to him. Misstatements wholly unrelated to the controversy, however, do not receive the *New York Times* protection." (*Waldbaum*, 627 F.2d at 1298.)

Plaintiff maintains that one could reasonably infer that the content of the broadcasts was unrelated to the MIS debate and served only to paint plaintiff as a fee-gouging, malpracticing podiatrist, and therefore, whether the actual malice standard applied was a question which should have been reserved for a jury's consideration.

█ Plaintiff's arguments are unavailing for several reasons. First, they are premised on his unsupported and incorrect assertion that since a genuine issue of material fact existed on the question of whether the broadcasts were germane to the MIS controversy, the court erred in granting defendants' motion for summary judgment. However, the United States Supreme Court, in one of the first occasions it had to apply the rule it had announced in *New York Times*, held that the question of whether one is a public figure is not to be relegated to the trier of fact to decide, but is a question of law to be left to the trial court for its resolution. (*Rosenblatt v. Baer* (1966), 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669; see also *Trotter v. Jack Anderson Enterprises, Inc.* (5th Cir. 1987), 818 F.2d 431, 434 ("Whether (and to what extent) a person is a public figure is a matter of law for the court to decide"); *Tavoulareas*, 817 F.2d at 772; *cf. Owen v. Carr* (1986), 113 Ill. 2d 273, 280, 497 N.E.2d 1145, 1148 (observing that, in a defamation action, whether a statement is a privileged opinion or an actionable assertion of fact is a question of law).)

Consequently, it is irrelevant to this appeal that a rational trier of fact could find that the broadcasts were not germane to the debate on the merits of MIS.

Moreover, applying the *Waldbaum* test, it is apparent that the broadcasts were intimately connected to the public controversy surrounding MIS; therefore, the trial court correctly held that in order to prevail in the action, plaintiff was required to prove that defendants misspoke while harboring "actual malice" toward him. *Waldbaum* suggests that statements concerning a limited public figure's "talents, education, experience and motives could [be] relevant to the public's decision to listen to [the limited public figure]." (*Waldbaum*, 627 F.2d at 1298.) Proceeding from that perception, the court in *Tavoulareas* determined that a story which referred to the fact that the plaintiff had placed his son in a lucrative venture which derived most of its revenue from a contract it held with a large oil company of which the plaintiff was president was germane to an on-going public debate on the need to reform how larger oil companies were managed. It held that the suggestion of the plaintiff's practice of nepotism was relevant to this debate because the plaintiff was a leading advocate for maintaining the status quo in the oil industry. Since the story impugned his credibility and integrity, it would likely affect the way in which the public perceived his message in that debate. *Tavoulareas*, 817 F.2d at 774.

Here, likewise, the broadcasts highlighted that plaintiff, the most renowned practitioner of a hotly debated procedure, which plaintiff admitted was commonly referred to as the "Kessler procedure," had allegedly committed malpractice while employing this controversial method of treating foot ailments. The fact that former patients of plaintiff were harmed by his use of MIS is certainly relevant to the debate about whether MIS is safer than traditional surgery. In addition, it would seem self-evident that former patients alleging that, due to plaintiff's implementation of MIS, they paid substantially more for foot surgery than they would have if they had undergone traditional foot surgery contradicts plaintiff's public representations that MIS is preferable to the traditional method primarily because it is more economical. Finally, the results attained by plaintiff in employing his procedure aid the public in its assessment of his credibility when he serves in his voluntarily assumed and self-described role as the "major general" in the "war over MIS." See *Reuber v. Food Chemical News, Inc.* (4th Cir. 1991), 925 F.2d 703 (holding that the publication of a letter which reprimanded the plaintiff, a limited public figure in the debate over whether a popular pesticide was a carcinogen, was

relevant to his public figure status because it bore on whether he was to be believed), *cert. denied* (1991), 501 U.S. 1212, 115 L. Ed. 2d 986, 111 S. Ct. 2814.

Plaintiff claims that with regard to a limited public figure, the *New York Times'* "actual malice" standard should apply only where a broadcast focuses primarily on the public controversy, and it indirectly and unintentionally challenges the public figure in its midst; but where, as here, the focal point of the broadcast is the limited public figure and it only indirectly touches upon the controversy, the normal negligence standard should apply to statements which defame the limited public figure. However, not only does plaintiff fail to offer authority for such a proposition,[1] but this "primary focus" argument is inconsistent with the rationale of the limited public figure doctrine. The United States Supreme Court has taken the position that those who expose themselves to the public in order to sway opinions "invite attention and comment," and in so doing, will be deemed by the law to accept the potential risk that the media, while illuminating the controversy, may, perhaps, cast them in an unfavorable light. (*Gertz*, 418 U.S. at 345, 41 L. Ed. 2d at 808, 94 S. Ct. at 3009.) The Court did not limit this to instances in which the public figure is assailed only obliquely in a report principally devoted to the subject matter of the controversy. Instead, the lesson of *New York Times* and its progeny is that in order to foster a robust public debate and provide for an in-

---

[1] In argument before this court, plaintiff suggested that *"Davis II"* recognized his "primary focus" view of the limited public figure doctrine. We assume from this rather elliptical identification that he was referring to this court's decision in *Davis v. Keystone Printing Service, Inc.* (1987), 155 Ill. App. 3d 309, 507 N.E.2d 1358, *appeal denied* (1987), 116 Ill. 2d 550, 515 N.E.2d 1219. But, after our review of that decision, we find nothing to indicate that the court even implicitly endorsed such a rule. In *Davis*, the defendant newspaper had published articles concerning the plaintiff tending to suggest that, as a locally prominent minister, he pressured members of his organization into homosexual encounters and coerced large cash contributions from his parishioners. The defendant argued that he was a limited public figure and, to prove its point, it offered articles published before the allegedly defamatory ones. The court disagreed and found that there was nothing in the earlier articles which were in any way related to the subject matter of the libelous articles. It noted:

> "Even if the earlier articles indicate that the plaintiff had injected himself into some public controversy, he would only be a limited purpose public figure for that particular controversy, but not for unrelated subjects." (*Davis II*, 155 Ill. App. 3d at 315, 507 N.E.2d at 1363.)

As we have expressed above, "The Walking Wounded" revolved around the MIS controversy and plaintiff's concededly influential role therein. Consequently, *Davis II* is inapposite to the case at bar, and plaintiff's "primary focus" theory still remains unsupported.

formed populace on issues of societal concern, the purveyors of news require "breathing space" to ensure that no self-censorship arises out of a fear of being found liable for defamation.

In all the cases we have discussed to this point, an allegedly defamatory statement had, as its primary focus, an individual deemed to be a limited public figure, but, in not one of those cases was it held that the "actual malice" standard did not apply. Rather, each recognized that where a statement bears on the credibility of a leading proponent of one side of a debated subject, that statement is relevant to that debate because of the effect it may have on the way society perceives the message he advances or the opinion he espouses. Since the "Walking Wounded" broadcast was relevant to plaintiff's credibility, as well as being highly probative of the actual efficacy of the controversial procedure plaintiff advocated *vis-a-vis* the one to which he compared it, it was germane to the controversy in which he was a limited public figure; consequently, the trial court did not err when it held that in order to prevail in his defamation action, plaintiff had to establish that defendants acted with actual malice.

## II

Plaintiff next contends that there existed a triable issue of fact as to whether defendant acted with actual malice and that, therefore, the trial court erred when it rendered summary judgment in favor of all defendants. Before reaching the substance of plaintiff's argument, however, we must first decide whether his failure to offer any argument in the trial court on the existence of actual malice and his conscious choice to file no counteraffidavits contradicting defendants' avowals that they did not act with actual malice toward him when making allegedly false statements constitute waiver of the issue for the purpose of our review.

## A

■ As all defendants emphasized in their respective briefs to this court, "It is axiomatic that questions not raised in the trial court are waived and may not be raised for the first time on review." (*Shell Oil Co. v. Department of Revenue* (1983), 95 Ill. 2d 541, 550, 449 N.E.2d 65, 69.) Each defendant also quoted this court's opinion positing that, "It is well established that summary judgment will be affirmed on review where a party in opposition to the motion had ample opportunity to obtain counteraffidavits but failed to do so." (*Smith v. South Shore Hospital* (1989), 187 Ill. App. 3d 847, 854, 543 N.E.2d 868, 871.) In the trial court, plaintiff argued that the "actual malice" standard was

not applicable to him, but offered nothing in the event that the court disagreed with this legal conclusion. This conduct could be seen as manifesting an intent to base his entire attack on the propriety of granting summary judgment on the legal question of the mental state he needed to prove in order to establish *prima facie* defamation, consequently abandoning any contentions regarding the issue of whether the record contained sufficient evidence to create a triable factual question on "actual malice."

Such a view of plaintiff's silence in the circuit court on the factual question would be fully consistent with the rule that finds expression in *Greves v. Firemen's Pension Fund* (1986), 147 Ill. App. 3d 956, 498 N.E.2d 618. There the plaintiff moved for summary judgment on two issues in an action seeking administrative review. In his motion, he asserted that the defendant board misapplied an amendment to the Illinois Pension Code (Ill. Rev. Stat. 1985, ch. 108½, par. 1—101 *et seq.*), erroneously offsetting his monthly allotment against moneys received from workers' compensation. He also maintained that he was entitled to a certain rate of prejudgment interest on the amount to be due. In response to the motion, the defendant board quarreled with regard to the first issue, but was silent as to whether and to what extent the plaintiff would be entitled to prejudgment interest. On appeal, the board asserted that the trial court erred on both issues. After affirming the trial court on the first assignment of error, the appellate court rejected the second issue out of hand, holding that the board's silence with regard to the prejudgment interest waived the issue for the purpose of appeal.

Plaintiff ignores the applicability of *Greves* to his appeal, responding to defendants' waiver argument by citing cases which state generally that an issue is waived on appeal if it went unargued in the trial court or if the court did not resolve it. (Citing *Weigel Broadcasting Co. v. Hammer* (1978), 67 Ill. App. 3d 805, 384 N.E.2d 811; *Harbor Insurance Co. v. Arthur Andersen & Co.* (1986), 149 Ill. App. 3d 235, 500 N.E.2d 707, *appeal denied* (1987), 113 Ill. 2d 574, 505 N.E.2d 353.) He clings to the disjunctive nature of that proposition as supportive of his contention that an issue is properly preserved for review if either of those two events occurs. Since the trial court decided that there was no issue as to whether defendants acted with actual malice, he deduces therefrom that the issue is preserved. However, the cases he cites provide him little comfort, for in neither instance did the court invoke the second clause of the disjunctive in order to find that an issue not asserted by the appellant in the trial court was nonetheless properly before it. Rather, we are led irresistibly to the

conclusion that in both instances, the court included that clause without contemplating its implications, as a gratuitous introduction to its core finding that the appellant had waived an issue. We decline to accord any deference to the mechanistically yet unnecessarily bloated rhetoric of those cases. Instead, we find the sounder rule to be that where a party does not argue an issue in the trial court, he will be deemed to have abandoned the point on appeal, absent extraordinary circumstances where justice necessitates review of an issue. (See, *e.g.*, *In re Marriage of Rodriguez* (1988), 175 Ill. App. 3d 241, 529 N.E.2d 819, *rev'd on other grounds* (1989), 131 Ill. 2d 273, 545 N.E.2d 731.) Therefore, applying that rule to the facts in the instant case, clearly, plaintiff, who filed nothing squarely addressing the issue of actual malice and who refrained from making any argument in that regard at trial, has waived that issue on appeal.

## B

Moreover, assuming *arguendo* that the issue has not been waived, we would nonetheless find no error because we are impelled to agree with the circuit court that there was no triable issue of fact as to whether defendants acted with actual malice toward plaintiff. The law applicable to the trial court's resolution of a motion for summary judgment and this court's subsequent review thereof is, by now, well settled. The motion permits the trial court to determine whether any genuine issue of material fact exists. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.) When deciding the motion, the trial court should construe all the evidence before it strictly against the movant. (*Reed v. Bascon* (1988), 124 Ill. 2d 386, 393, 530 N.E.2d 417, 420; *Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.) Our supreme court has warned that while summary judgments are to be encouraged in the interests of the prompt disposition of lawsuits, they are a drastic measure. (*Bascon*, 124 Ill. 2d at 393, 530 N.E.2d at 420; *Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.) Consequently, trial courts should grant summary judgments only where the movant's right to judgment is so clear as to be free from doubt. *Bascon*, 124 Ill. 2d at 393, 530 N.E.2d at 420; *Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.

Although, as a general rule, this court reviews the grant of summary judgment *de novo* (*Myers v. Health Specialists* (1992), 225 Ill. App. 3d 68, 72, 587 N.E.2d 494, 497, *appeal denied* (1992), 145 Ill. 2d 635, 596 N.E.2d 630), because this case involves constitutionally protected speech, we must temper our review of the instant judgment with the understanding that

"a court ruling on a motion for summary judgment must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice has been shown with convincing clarity." (*Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 257, 91 L. Ed. 2d 202, 217, 106 S. Ct. 2505, 2514-15.)

(See also *Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 532 N.E.2d 790 (holding that in order to recover in a defamation action, a "public official" plaintiff must prove with clear and convincing evidence that defendant broadcast a defamatory statement with knowledge that it was false or with a reckless disregard of its truth or falsity).) We are also mindful of the fact that like the *Butts* standard, the actual malice rule often requires inquiry into the defendant's state of mind and may therefore be difficult to invoke successfully on a motion for summary judgment.

1

Defendants Zekman and CBS, Inc., assert that since the record is devoid of any evidence which would even tend to establish that Zekman acted with actual malice, plaintiff's cause could not survive a motion for summary judgment even if the normal preponderance of evidence standard applied. They conclude, therefore, that he is necessarily incapable of meeting the more stringent "clear and convincing" standard which controlled this particular motion. Plaintiff counters by claiming that a deposition Zekman gave, which they now seek to include as a supplement to the record on review, provides sufficient proof that she knew that the statements she aired in her report were false, thus creating a triable issue of fact, warranting preclusion of summary judgment in this instance.

In order to decide whether the plaintiff's contention merits closer scrutiny, we must first resolve plaintiff's motion to supplement the record with the deposition, which motion we took with the case. In that motion, he asks us to exercise our power under Supreme Court Rule 366(a)(3) (134 Ill. 2d R. 366(a)(3)) and add to the record on appeal the Zekman deposition which, albeit not presented to the trial court before it granted summary judgment in favor of defendants, is nonetheless necessary, plaintiff argues, to a just resolution of his appeal. However, while it is true that Rule 366(a)(3) allows us to amend the record to correct errors and to supplement by adding matters which it should contain, "it is axiomatic that new evidence not offered during

the trial of a cause cannot be introduced for the first time on appeal." (*Catalano v. Pechous* (1978), 69 Ill. App. 3d 797, 813, 387 N.E.2d 714, 726, citing *H.J. Tobler Trucking Co. v. Industrial Comm'n* (1967), 37 Ill. 2d 341, 226 N.E.2d 601; *Kohler v. Central & Southern Truck Lines, Inc.* (1977), 45 Ill. App. 3d 621, 360 N.E.2d 89; see also *In re Application of County Treasurer* (1987), 171 Ill. App. 3d 644, 525 N.E.2d 852, *appeal denied* (1988), 123 Ill. 2d 558, 535 N.E.2d 399; *Hall v. Svea Mutual Insurance Co.* (1986), 143 Ill. App. 3d 809, 493 N.E.2d 1102.) It is of no consequence that, in the case at bar, the decision appealed from arose from a motion for summary judgment, for the rule of *Pechous* applies equally to such a case. See *James v. Yasunaga* (1987), 157 Ill. App. 3d 450, 452, 510 N.E.2d 531, *appeal denied* (1987), 116 Ill. 2d 559, 515 N.E.2d 109 (denying plaintiff's motion to supplement record in an effort to show that trial court erroneously granted summary judgment because "[an appellate court] cannot consider upon review that which was not submitted to the trial court when it rendered its decision").

The one case plaintiff relies upon in support of the novel proposition he advances, *Welch v. Chicago Tribune Co.* (1975), 34 Ill. App. 3d 1046, 340 N.E.2d 539, does not call for a radical departure from the well-established rule we have cited above. In *Welch*, without citation to precedent, the court allowed the supplementation of the record to include depositions of the plaintiff and others, and invoked its Rule 366(a)(3) power to do so. It is to be noted, however, that the court indicated that no party had objected to the additional evidence and that both used the additional evidence in order to support or refute points raised on appeal. In contrast here, defendants Zekman and CBS, Inc., vigorously objected to the proffering of the Zekman deposition both in their brief on appeal and in a memorandum in opposition to plaintiff's motion to supplement the record. Since defendants here do not consent to the additional evidence, *Welch* is inapposite and *Pechous* applies, thereby foreclosing plaintiff from including the disputed deposition in the record on appeal; and given that without the supplemental evidence the record is barren of anything which even intimates that she acted with "actual malice," the trial court's grant of summary judgment in favor of Zekman and CBS, Inc., is affirmed.

## 2

Plaintiff additionally urges that the trial court mistakenly granted summary judgment in favor of the doctor defendants because there is evidence in the record from which the court could have inferred that they had a motive to defame plaintiff, creating a factual issue as to

their actual malice. He argues that the intent of the doctors was evident from the fact that they made the allegedly false statements about him while a suit, filed by him and which named them as defendants, was pending in the circuit court of Cook County. However, plaintiff urges the presence of these inferences for the first time on review; therefore, in view of his failure to draw them for the benefit of the trial court, he cannot now be heard to complain that the court somehow erroneously overlooked them. See *Yasunaga*, 157 Ill. App. 3d at 452, 510 N.E.2d at 533 (while reviewing the propriety of a summary judgment, the court declined to consider portions of a deposition because the record was insufficient to manifest that the offered portions were, in fact, brought to the attention of the trial court); *Northern Illinois Gas Co. v. Energy Cooperative, Inc.* (1984), 122 Ill. App. 3d 940, 461 N.E.2d 1049 (on review of a summary judgment wherein the trial court found that there was no event which excused performance of a contract on impossibility grounds, appellate court refused to consider other *force majeure* events because they were never presented to the trial court as alternative grounds to excuse performance).

Furthermore, even were we to consider plaintiff's proffered inferences, we would still be compelled to affirm the trial court's finding that there was not a genuine issue of material fact regarding whether the defendant doctors misspoke with malice toward plaintiff. As previously noted, where the protections of *New York Times* apply, in order to withstand a summary judgment motion a plaintiff must present evidence such that a reasonable trier of fact could find that he had established the requisite fault by the clear and convincing evidence standard. (*Liberty Lobby, Inc.*, 477 U.S. at 257, 91 L. Ed. 2d at 217, 106 S. Ct. at 2514-15.) To meet this burden, plaintiff relies solely upon the evil motives of defendants, which, he suggests, can be drawn from the fact that at the time they made the allegedly libelous statements, they were named as defendants in the suit he had filed against them. We have held, however, that proof of personal animosity alone is insufficient to meet the high burden imposed by the *New York Times* standard. (*Winters v. Greeley* (1989), 189 Ill. App. 3d 590, 594, 545 N.E.2d 422, 425, *appeal denied* (1989), 128 Ill. 2d 673, 548 N.E.2d 1079.) Instead, the limited public figure plaintiff must also establish clearly and convincingly that the defendant coupled his rancor toward the plaintiff with a knowledge of the falsity of the statement complained of, or a reckless disregard as to its truth or falsity. *Winters*, 189 Ill. App. 3d at 594, 545 N.E.2d at 425; *Fopay v. Noveroske* (1975), 31 Ill. App. 3d 182, 192, 334 N.E.2d 79, 88 ("Thus, at a minimum, plaintiff has the

burden of establishing that the libelous materials were published in the face of serious doubts as to the truth of the matter asserted or, stated otherwise, without a good faith belief in the truth of matters published, in order to overcome the protection afforded the published materials by the constitution").

The defendant doctors all filed affidavits attesting to the fact that they entertained no serious doubts as to the truth of the statements concerning plaintiff when they made them. Although generally a defendant's self-serving declaration swearing that he subjectively believed the truth of the false assertion will not negate a showing of actual malice (see, *e.g., Pease v. International Union of Operating Engineers Local 150* (1991), 208 Ill. App. 3d 863, 879, 567 N.E.2d 614, 625 (Reinhard, J., dissenting)), that truism does not apply in the instant case as plaintiff has not shown all the elements of actual malice; for as we have already noted, where, on review of summary judgment, affidavits are not contradicted by counteraffidavits, this court must accept as admitted those facts averred in the affidavit. (*Kellerman v. Mar-Rue Realty & Builders, Inc.* (1985), 132 Ill. App. 3d 300, 476 N.E.2d 1259; *Harris v. Bethlehem Steel Corp.* (1984), 124 Ill. App. 3d 449, 464 N.E.2d 634.) Accordingly, since the doctor defendants' affidavits stand as admitted on the issue of whether they spoke without any serious doubts as to the truth of their assertions that plaintiff had committed malpractice, plaintiff has failed to establish "actual malice" by clear and convincing evidence; therefore, the court's grant of summary judgment in favor of the doctors is affirmed as well.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.