REVEREND L. R. DAVIS, Plaintiff-Appellant, v. KEYSTONE PRINTING SERVICE, INC., d/b/a The News-Sun *et al.*, Defendants-Appellees.

Second District No. 86—288

Opinion filed May 7, 1987.

Michael J. Cummins, of Waukegan, for appellant.

Murray R. Conzelman, of Conzelman, Schultz, Snarski & Mullen, of Waukegan, and Gerald F. Lutkus and Samuel Fifer, both of Isham, Lincoln & Beale, of Chicago, for appellees.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, Rev. L. R. Davis, brought a libel action against Keystone Printing Service, Inc., publisher of the News-Sun, a Lake County newspaper, and Adrienne Drell, a reporter for the News-Sun, based on a series of articles published in defendants' newspaper. The trial court, on defendants' motion for summary judgment, found plaintiff to be a limited purpose public figure and that the subjects of the articles were matters of public concern, thereby requiring plaintiff to prove malice on the part of defendants. The trial court further found that there was no evidence from which a finding of malice could be made by a trier of fact and granted summary judgment for defendants. From that order plaintiff appeals. For the reasons set forth below, we reverse.

On February 19, 1980, the News-Sun published the first in a series of articles which plaintiff claims libeled him. The articles reported that plaintiff lured members of his religious organization into homosexual encounters, promoted illegal absences from the United States

Navy, and encouraged large personal contributions ($100,000 from one family alone). The articles were based mainly on interviews conducted by Drell. Subsequent articles, eight in all, contained further details.

A full recital of the facts of this case, both disputed and undisputed, would be inordinately lengthy. Specific facts will only be set out as needed. More details appear in this court's opinion in *Davis v. Keystone Printing Service, Inc.* (1982), 111 Ill. App. 3d 427 (hereinafter *Davis I*).

This is the second time this matter has been before this court. Previously, the trial court dismissed the complaint based on its conclusion that plaintiff was a public figure and that he had failed to allege actual malice on the part of defendants. This court held that it was error for the trial court to find plaintiff to be a public figure based only on the pleadings and the articles in question. (*Davis v. Keystone Printing Service, Inc.* (1982), 111 Ill. App. 3d 427.) We further held that plaintiff had sufficiently alleged malice to withstand a motion to dismiss. (111 Ill. App. 3d 427, 443.) The trial court's dismissal of plaintiff's complaint was thus reversed, and the cause was remanded for further proceedings.

On remand, defendants filed a motion for summary judgment and in support of their motion submitted affidavits and deposition transcripts from defendant Drell, editors of the News-Sun, and other persons familiar with plaintiff's activities, as well as past News-Sun articles in which plaintiff had been mentioned. Based on this additional information the trial court granted defendants' motion.

■ The first issue we must decide is whether plaintiff was properly required to prove that the articles in question were published with actual malice. In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, the United States Supreme Court first held that the constitutional freedoms of speech and press preclude a public official from recovering damages for defamation relating to his official conduct unless he can prove that the statement was made with actual malice. Malice was defined as publishing with knowledge that the statement was false or with reckless disregard of whether it was false or not. (376 U.S. 254, 280, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726.) The *New York Times* rule was subsequently extended to cover "public figures" as well as public officials in *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975.

It was expected that the *New York Times* protection would be extended to statements regarding matters of public concern or interest. (See, *e.g.*, W. Prosser, Torts sec. 118, at 823 (4th ed. 1971).) That ex-

pectation received considerable support from the decision in *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811, where a plurality indicated that such an extension was warranted. That position was soon rejected, however, in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, where the court specifically refused to apply the *New York Times* privilege according to the subject matter of the statements. Instead, the *Gertz* court focused on the status of the defamed plaintiff and distinguished between public and private figures. The court held that at least where the substance of the defamatory statement makes substantial damage to reputation apparent, and so long as they do not impose liability without fault, the States may define the appropriate standard of liability for a publisher of defamatory falsehood injurious to a private individual. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 347, 41 L. Ed. 2d 789, 809, 94 S. Ct. 2997, 3010.

Subsequent Illinois decisions have evinced some confusion over the standard of liability to impose where the plaintiff is a private figure. Illinois law will be discussed shortly, but an analysis of whether defendants should enjoy the *New York Times* constitutional protection is warranted first. If plaintiff is a public figure for *New York Times* purposes, the possibility of a less stringent standard under Illinois law would be foreclosed.

■ In *Curtis Publishing Co. v. Butts*, the Supreme Court equated a public figure with one who commands a substantial amount of public interest by his position alone or one who by his purposeful activity has thrust himself into the vortex of an important public controversy. (388 U.S. 130, 155, 18 L. Ed. 2d 1094, 1111, 87 S. Ct. 1975, 1991.) The extension of the *New York Times* privilege was justified since such public figures command sufficient continuing public interest and have sufficient access to means of counterargument to be able "to expose through discussion the falsehood and fallacies" of the defamatory statements. (388 U.S. 130, 155, 18 L. Ed. 2d 1094, 1111, 87 S. Ct. 1975, 1991, quoting *Whitney v. California* (1927), 274 U.S. 357, 377, 71 L. Ed. 1095, 1106, 47 S. Ct. 641, 649 (Brandeis, J., dissenting).) In *Gertz*, the court further noted that public figure status may rest on either of two alternative bases:

> "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special promi-

nence in the resolution of public questions." *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 351, 41 L. Ed. 2d 789, 812, 94 S. Ct. 2997, 3013.

The court cautioned, however, that it would not lightly assume that one's participation in community affairs renders him a public figure for all purposes. The court preferred instead "to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. 323, 352, 41 L. Ed. 2d 789, 812, 94 S. Ct. 2997, 3013.

The trial court here found plaintiff to be a general purpose public figure when it first dismissed the complaint. In granting summary judgment for defendants, however, the trial court found that plaintiff is only a limited purpose public figure. Defendants do not contend on this appeal that plaintiff is a general purpose public figure, so we need only consider whether plaintiff is a limited purpose public figure for the issues which were the subjects of the articles.

Defendants argue that plaintiff injected himself into local public controversies in several ways: (1) by affecting the relationship between Waukegan, North Chicago, and the Great Lakes Naval Station; (2) by opening a storefront ministry; (3) by opposing drug and alcohol addiction; (4) by becoming involved in local politics and working with adults on probation from the Lake County courts; and (5) by making public speeches, television and radio appearances, and being involved in entertainment. This court rejected similar contentions in *Davis I*, noting: "This is not a case where there was in existence a public issue in which plaintiff became involved and attempted to influence public opinion. *There was no public controversy prior to the articles.*" (Emphasis added.) *Davis v. Keystone Printing Service, Inc.* (1982), 111 Ill. App. 3d 427, 438.

We now have before us more information regarding plaintiff's activities than we did in *Davis I*. There, the only information was the pleadings and the defamatory articles. From the newspaper exhibits we gleaned the following: Plaintiff was president of Christian Fellowship, Inc., a tax-exempt religious organization, which sponsored a servicemen's center near the naval base and offered help and refuge to those with problems such as drug addiction, alcoholism, and prostitution; he talked to sailors on the "strip" on Sheridan Road in North Chicago; he was the leader of the Waukegan-based Good News Singers, who "have appeared on nationwide TV and radio, sung on the steps of the capitol in Washington, D.C., been photographed with politicians and celebrities and entertained throughout the country for

civic and veterans' organizations"; he had been involved in a controversy 13 years earlier in Arkansas, where he had a "general" certificate to preach for the United Pentecostal Church and was dropped following criticism for alleged homosexual advances to young men; he was contemplating a geographic expansion of his organization to two other towns with military bases; and he had participated in a probation program as a supervisor until he was barred following complaints of sexual advances. *Davis v. Keystone Printing Service, Inc.* (1982), 111 Ill. App. 3d 427, 437.

Defendants have now supplied us with older newspaper articles, affidavits or persons familiar with plaintiff's activities, and deposition testimony. From this additional information, defendants conclude that plaintiff injected himself into a preexisting public controversy. After examining the additional evidence, however, it seems that our original conclusion is still valid. There simply was no public controversy giving rise to the defamation prior to the publication of the alleged defamatory articles.

■ The older articles are relevant to the question of plaintiff's limited purpose public figure status only to the extent that they may relate to the particular controversy giving rise to the alleged defamatory articles. Even if the earlier articles indicate that plaintiff had injected himself into some public controversy, he would only be a limited purpose public figure for that particular controversy, but not for unrelated subjects. Therefore, our review of the older articles is limited to ascertaining the extent to which they indicate plaintiff's participation in a particular controversy giving rise to the alleged defamatory articles. See, *e.g., Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 346-47, 41 L. Ed. 2d 789, 809, 94 S. Ct. 2997, 3010.

From our examination of the earlier articles, it appears that they are, at best, minimally related to the alleged defamation. The additional articles indicate that several years prior to the publication of the articles in question, plaintiff addressed students at a local community college in rebuttal to a speech by noted atheist Madalyn Murray O'Hair. From the articles, it seems that plaintiff merely advocated religious beliefs in response to O'Hair's promotion of atheism. An isolated lecture to approximately 100 students by a minister opposed to atheism is hardly enough to make plaintiff a public figure, especially for any topic beyond atheism, and more to the point, did not concern a controversy which gave rise to the alleged defamation.

Nor do appearances with the Good News Singers make plaintiff a limited purpose public figure for this case. Although the group has sung the national anthem at Wrigley Field and Comiskey Park and

performed at Christmas tree burning ceremonies in Waukegan, the group did not inject itself into any public controversies related to this action. To the contrary, it seems that the group sang patriotic and nondenominational songs and that plaintiff was not permitted to sermonize at any of these occasions, other than at actual church services. The singing appearances are thus irrelevant to the question of whether plaintiff is involved in a controversy giving rise to the alleged defamation.

Defendants further contend that by opposing drug and alcohol addiction plaintiff has thrust himself into public controversy. Again, however, we fail to discern how plaintiff's opposition to these plagues on our society relates to a controversy giving rise to the defamation. The alleged defamatory articles have nothing to do with drug and alcohol addiction, other than the fact that the informants were former or continuing addicts.

Defendants also argue that plaintiff attained public figure status because he purports to be a religious figure. The cases relied on by defendants, however, are not similar to the present case. The religious figures in those cases were either general purpose public figures, such as Jerry Falwell (*Falwell v. Penthouse International, Ltd.* (W.D. Va. 1981), 521 F. Supp. 1204), or had injected themselves into public controversies beyond religion itself, such as the Catholic priest who attempted to influence public opinion regarding the Irish Republican Army in Northern Ireland (*McManus v. Doubleday & Co.* (S.D.N.Y. 1981), 513 F. Supp. 1383). Although plaintiff may have had aspirations of greater fame, his hopes for nationwide prominence were clearly not realized, and we do not believe that his involvement in religion is equivalent to injecting himself into a public controversy which gave rise to the alleged defamation.

Lastly, defendants argue that plaintiff attained limited purpose public figure status through his involvement with local politics and the probation system. There is evidence that plaintiff courted the friendship of various political figures including his local congressman, State senator, and local mayors. There is no evidence, however, that he made political speeches or other appearances. We previously noted a lack of specific information regarding plaintiff's involvement with the probation system. Defendants have now submitted affidavits of several persons involved in the probation system regarding their involvement with plaintiff. They indicate that plaintiff was present and performed at a dinner for volunteers in the probation system. They also indicate that plaintiff was involved in supervising at least one probationer and that his supervision was terminated. There is still no indi-

cation, however, that plaintiff's involvement with the probation department was known to the public. Furthermore, plaintiff's relationship with local political figures was not a subject of the alleged defamation. Finally, we would note that, despite defendants' contentions of plaintiff's local renown, defendant Drell admitted that she did not know much about plaintiff or whether his reputation was good or bad prior to working on the articles in question. As in *Davis I,* it again appears that plaintiff was not a public figure for purposes of the defamatory articles.

Although plaintiff is not a limited purpose public figure so that the constitutional privilege of *New York Times* would apply, the *Gertz* court left to the States the question of what standard to apply when a libel plaintiff is a private citizen. Illinois is thus free to apply any standard of liability short of absolute liability in private defamation cases. Illinois is also free to extend the *New York Times* malice requirement to such cases, although we are not constitutionally required to do so.

Defendants argue that Illinois requires proof of malice where the subject area concerns matters of public interest or concern. That argument is supported to some extent by Illinois case law. But, as noted above, Illinois decisions are not entirely consistent in this area.

Prior to the *Gertz* decision, the Illinois Supreme Court held that a defendant publisher was entitled to the benefit of the *New York Times* privilege where alleged defamatory articles concerned medical quackery. (*Farnsworth v. Tribune Co.* (1969), 43 Ill. 2d 286.) The court relied on pre-*Gertz* cases for the proposition that statements regarding matters of public interest trigger constitutional protection. (43 Ill. 2d 286, 291.) While the *Farnsworth* decision was justifiable in light of the then trend toward expanding constitutional protection, the *Gertz* decision explicitly rejected the "public concern" test for constitutional protection. 418 U.S. 323, 346, 41 L. Ed. 2d 789, 809, 94 S. Ct. 2997, 3013.

After *Gertz* rejected the public concern test and left to the States the standard of liability in cases of private plaintiffs, the Illinois Supreme Court decided *Troman v. Wood* (1975), 62 Ill. 2d 184. The *Troman* court analyzed the *Gertz* decision and recognized that Illinois was not constitutionally bound to require proof of malice where the plaintiff was a private individual. The court then held:

> "[I]n a suit brought by a private individual to recover actual damages for a defamatory publication whose substantial danger to reputation is apparent, recovery may be had upon proof that the publication was false, and that defendant either knew it to

be false, or, believing it to be true, lacked reasonable grounds for that belief. We hold further that *negligence may form the basis of liability regardless of whether or not the publication in question related to a matter of public or general interest.*" (Emphasis added.) 62 Ill. 2d 184, 198.

Unfortunately, however, the *Troman* court failed to distinguish *Farnsworth*, and the public interest test resurfaced in *Colson v. Steig* (1982), 89 Ill. 2d 205.

In *Colson*, an assistant college professor sued his department chairman for remarks the chairman made to personnel committees evaluating Colson's performance and deciding whether Colson should be granted tenure. The court did not decide whether Colson was a public or private figure, but instead followed *Farnsworth* and found that the case qualified "under the *Butts* test as a subject about which information is needed or appropriate to enable members of the committee to cope with the issues confronting them." (89 Ill. 2d 205, 213.) Noting the need for the free flow of information and for vigorous and uninhibited discussion in the teacher evaluation process, the court concluded: "In light of the limited scope of the publication and the interest and concern of the group to whom the statement was published, we find that the first amendment privilege of *New York Times* must be applied to the statement made by defendant." 89 Ill. 2d 205, 213.

We do not construe the *Colson* opinion to mean that the *New York Times constitutional* privilege is afforded a media defendant simply because a defamatory statement concerns an item of "public interest." The *Gertz* court had specifically rejected that notion, as was made clear in later Supreme Court cases. (See, *e.g., Time, Inc. v. Firestone* (1976), 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958.) Any item in a newspaper is arguably one of public interest. Rather, we read *Colson* as requiring proof of malice as a matter of *common law* privilege in light of the limited extent of the publication, plaintiff's opportunity for rebuttal, and the need for the information by the evaluation committees, but not as a matter of constitutional law. See, *e.g., American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 632.

In *Davis I*, this court recognized that the malice requirement of *Colson* was justified by the limited extent of publication, plus Colson's opportunities to directly refute the defamatory statements. (*Davis v. Keystone Printing Service, Inc.* (1982), 111 Ill. App. 3d 427, 440.) The *Colson* court itself realized that a realistic opportunity to counteract false statements is an important factor in requiring proof of malice, and further cautioned:

"If the defendant in our case would have published the statement in question to the public in general, it is possible that the plaintiff would not have had sufficient access to the channels of communication to overcome or offset the damaging effect of defendant's statement. We make no assessment of the propriety of the use of the *New York Times* privilege in such a situation." (*Colson v. Steig* (1982), 89 Ill. 2d 205, 214.)

Here defendants distributed the defamatory statements to the general public. No attempt was made to limit publication to a specific group needing information, such as Navy personnel or church members.

The day the first defamatory article was printed, a small side bar appeared in which plaintiff denied the defamatory accusations. Some of the articles also contained denials. In *Davis I*, we found that, "[g]iven the numerous articles published, the negative context of the articles in which these [denials] appear, and the paucity of these exculpatory statements, they hardly amount to effective rebuttal." (*Davis v. Keystone Printing Service, Inc.* (1982), 111 Ill. App. 3d 427, 440.) Although that finding was based only on the articles themselves, the additional information supplied by defendants does not change the conclusion. Although it appears that plaintiff published a newsletter, it was distributed only to church members or those requesting copies. Such a limited publication hardly seems effective rebuttal to a county-wide general circulation newspaper. We previously noted Drell's refusal to examine the church records as an indication of limited access to rebuttal. Plaintiff has also indicated that immediately after the first article was published, several persons contacted defendants to refute the stories but that no action was taken to check those statements. Taken as a whole, the additional information does not alter the conclusion that plaintiff's access to meaningful rebuttal was very limited.

■ In *Davis I*, this court noted that the issue of whether plaintiff should be required to prove malice was a close one. (111 Ill. App. 3d 427, 441.) Defendants had not supplied detailed information from which we could conclude that the *New York Times* privilege should apply. Although we now have more details, the information supplied is similar to that of which we were already cognizant. Therefore, the court again erred in finding plaintiff to be a limited purpose public figure.

■ The next issue is whether plaintiff has raised a triable question of malice. Even though we find that plaintiff is not a public figure and that the *Colson* privilege is not applicable, he must still prove that defendants published with actual malice to recover punitive damages. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 349, 41 L. Ed.

2d 789, 810, 94 S. Ct. 2997, 3011.

To prove actual malice, plaintiff must clearly prove that defendants made the defamatory publications with knowledge that they were false or with reckless disregard of whether they were false or not. (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726.) "There must be sufficient evidence to permit the conclusion that the defendant[s] in fact entertained serious doubts as to the truth of [their] publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325.

While the inquiry here is necessarily subjective, defendants' claims that they believed the allegations true are not dispositive. (*Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 170, citing *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 511 n.30, 80 L. Ed. 2d 502, 524 n.30, 104 S. Ct. 1949, 1965 n.30.)

> "The defendant in a defamation action *** cannot *** automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is *** based wholly on an unverified anonymous telephone call. *** Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267-68, 88 S. Ct. 1323, 1326.

In this case, plaintiff argues that defendants were aware of several obvious reasons to doubt the veracity of the informants. The trial court, however, found "no evidence" of actual malice and granted summary judgment for defendants on that basis. A motion for summary judgment should be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240; Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) Summary judgment is a "drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt." (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) Furthermore, in determining whether a genuine issue of material fact exists, courts must construe the pleadings, depositions, admissions, exhibits, and affidavits strictly

against the movant and liberally in favor of the opponent. (*Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 398.) In ruling on this particular motion, however, we "must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, ___, 91 L. Ed. 2d 202, 217, 106 S. Ct. 2505, 2515.

Defendants, of course, deny any doubts about the truth of their informants' allegations. As noted above, such denials are not conclusive. Defendants, however, also point to the efforts Drell made to verify the informants' statements. She checked their employment records and discovered the informants worked where they said they did. She also checked naval records and attempted to verify that the informants had actually spoken with various investigative agencies as they claimed they had. She received the Christian Fellowship's exemption documentation from the IRS, as well as memoranda from a News-Sun intern who visited the Servicemen's Center. In addition, she obtained sworn statements from her informants in which they verify that a written transcript of their interview with Drell accurately reflected their statements. The informants did not swear, however, that they had spoken the truth.

Plaintiff, on the other hand, points to circumstances which should have made Drell doubt her sources. Drell interviewed plaintiff two days before the first article was published, and at that time plaintiff revealed information adversely reflecting on the informants' credibility. He told Drell that one of her informants had been expelled from the church for continued drunkenness, stealing liquor from the hotel in which the Fellowship maintained offices, and pointing a gun at another church member. Plaintiff informed Drell that her informants had already threatened to ruin plaintiff's reputation, but that one of the informants had recently come to plaintiff and apologized for making false statements to the newspaper. Moreover, plaintiff repeatedly denied the defamatory allegations.

Plaintiff notes that Drell first interviewed the informants nine months before the articles were published. This delay, he contends, demonstrates that the stories were not "hot news" and, therefore, defendants should have more thoroughly investigated the charges. Defendant correctly points out that plaintiff's denial of the allegations would not alone require further investigation. (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 160.) More importantly, failure to investigate

does not in itself establish bad faith. (*St. Amant v. Thompson* (1968), 390 U.S. 727, 731-32, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1326.) Failure to investigate further does not, however, completely insulate defendants since a newspaper's fact-gathering abilities may "raise the spectre of reckless disregard when their use has revealed *** information which creates substantial doubt as to the truth of the published allegations." (*Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 172.) Plaintiff claims here that Drell had discovered substantial reason to doubt the truth of the allegations.

■ It would seem that the aforementioned factors undermining the informants' credibility would not alone be enough to require further investigation. Reliance upon sources antagonistic to the subject of an alleged libel does not constitute actual malice where sources were in a position to know and where their assertions are not so improbable as to engender serious doubt. (*Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 172, citing *Kidder v. Anderson* (La. 1978), 354 So. 2d 1306, 1309.) Plaintiff, however, did more than assert the unreliability of the informants.

One of the informants, Don Carver, a relative of the other informants, told Drell that he had paid for a Cadillac belonging to Christian Fellowship. When Drell interviewed plaintiff, he produced checks in payment for the Cadillac from Christian Fellowship, not Carver. This was undeniable evidence that Carver had lied. Plaintiff had already told Drell that the informants had promised to ruin him, and plaintiff then presented direct evidence to confirm that informants were acting on that promise. It seems that at this point there was reason to doubt the trustworthiness of Carver, if not all the informants.

In addition, plaintiff offered to open all the Fellowship's books to Drell and the News-Sun. This offer is very relevant considering the charges of financial impropriety leveled against plaintiff. Plaintiff claims that Drell promised to come back and investigate further. Drell never returned. Defendants now try to justify their failure to investigate by claiming Drell was not qualified to review the books and because she could not be sure that the figures in the books would be accurate. This attempted rationalization is unconvincing. She could easily have returned with an accountant to examine the books. Having already been alerted to a clear discrepancy in the informants' stories, Drell ignored plaintiff's offer by which she could have either confirmed her sources or found more discrepancies. This would seem to be the type of behavior a jury could classify as reckless.

More reason to doubt the informants arose after the first article was published. John Collins, manager of the hotel where the Service-

men's Center was located, contacted an editor of the News-Sun to refute many of the allegations and offered names of others who could do likewise. Collins claims the editor said he did not necessarily believe the sources. Although defendants claim Collins was motivated to protect the good name of his hotel, we are in no position to judge his credibility against the editor's. It also appears that a vice-president of Christian Fellowship again offered to show defendants the books, but was turned down, and that another member, when he offered to refute the charges, was told by Drell that she was only interested in substantiating her stories.

 ██ Whether clear and convincing evidence of actual malice has been shown is a question of fact. (*Erickson v. Aetna Life & Casualty Co.* (1984), 127 Ill. App. 3d 753, 764.) Although defendants did some investigation into the sources' reliability, facts which later came to light would seem to have required further investigation. Plaintiff may not be able to convince a jury that defendants doubted the accuracy of the articles but he has presented a material issue of fact which should be decided by the jury. The trial court's order granting summary judgment on the issue of malice must therefore be reversed.

Defendants have also argued that four additional grounds exist on which we can affirm the trial court's order. First, defendants contend that plaintiff cannot prove that defendants lacked reasonable grounds to believe the information they published was true. Interestingly, defendants rely on *Troman v. Wood* (1975), 62 Ill. 2d 184, for this proposition while strenuously arguing previously that *Troman* is inapplicable. *Troman*, however, held that a private plaintiff may recover upon proof of negligence by defendants. Since we have already concluded that a triable issue of malice exists, it would be incongruous to suggest that plaintiff cannot prove a less culpable deviation from the truth.

 Defendants next argue that the doctrine of "neutral reportage" extends a privilege to the articles in question. That doctrine, however, is "narrowly limited to a factual situation which is presented when a responsible prominent person or organization makes serious charges against a public figure and those charges are reported in an accurate and disinterested manner." (*Fogus v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1060, 1063.) That privilege is inapplicable here for two reasons. First, the charges must be against a public figure and plaintiff here is a private figure. Second, the charges must be made by a "responsible prominent person." Here, most of the charges were made by alleged alcoholic, ex-drug addicts who had already professed a desire to harm plaintiff's reputation. The only exception to

this is the report of plaintiff's ban from the probation system, but even then the first step above is not met since plaintiff is a private person.

■■ The third ground urged by defendants is that the February 25, 1980, editorial is merely an opinion. The sentence, "The Reverend L. R. Davis, founder of Lake County's Good News Singers, is the latest example of questionable leadership that has been accepted without question because he acted in the name of Christianity," does seem to be pure opinion protected under *Gertz*. The other complained-of sentence, however, goes beyond opinion to state as fact that the Good News Singers are involved in homosexuality and is not protected as opinion.

Finally, defendants urge that several of the articles are privileged as reports of governmental proceedings. Unfortunately, however, the reports are also interspersed with reiterations of the previous defamatory statements in addition to the government proceedings and thus are not privileged.

This is a complicated area of the law and the issues here are close. Nevertheless, it does not appear that plaintiff's activities elevated him to public figure status. The articles in question, having been distributed to the general public, do not enjoy the *Colson* context privilege. Plaintiff has presented evidence from which a jury could conclude defendants were reckless in publishing the statements. The alternative grounds urged by defendants apply to only one of the many complained-of statements. The trial court's order is therefore reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

LINDBERG, P.J., and HOPF, J., concur.