Volterra, J.
This action is before the court on defendant’s motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Mass.R.Civ.P. 56(c).[1] Since materials aside from the pleadings have been presented and both parties have had an opportunity to present materials pertinent to a summaiyjudgment motion, the court will treat defendant’s motion as one for summaiyjudgment. Mass.R.Civ.P. 12(c). The underlying action involves claims for defamation, intentional infliction with a contractual relationship and loss of consortium. For the reasons outlined below, defendant’s motion is DENIED.
BACKGROUND
The undisputed facts are as follows:
The plaintiff, Reverend Erskine White (“Rev. White”), is a natural person currently residing in Asheville, North Carolina. Plaintiff Caroline White is a natural person currently residing in Asheville, North Carolina and is Rev. White’s wife. The defendant, Dr. Susan Holton (“Dr. Holton”), is a natural person residing in Framingham, Massachusetts and is director of Gabriel Ames Associates, a business involved in conflict management and resolution. The First Congregational Church of Melrose (the “Church”) is a Protestant Church and a United Church of Christ. The governing body of the Church is the Diaconate (“Diaconate”). Reverend Charles Harper (“Rev. Harper”) is the Associate Conference Minister for the Massachusetts Conference, United Church of Christ and is responsible for pastoral oversight of United Church of Christ churches in the Boston area.
Rev. White was hired by the First Congregational Church of Melrose (the “Church”) to act as senior minister and began working as senior minister in May of 1989. Rev. White’s employment contract included a provision that either party could terminate the contract with 90 days notice. At some point a number of congregation members became displeased with Rev. White’s ministry. On November 26, 1991, at a regularly scheduled meeting of the Diaconate, Rev. White was asked to resign. Rev. White refused to resign at that time and both Rev. White and the Diaconate agreed to attempt to have their disputes resolved through a process of mediation.
Rev. Harper suggested the names of a number of outside consultants, four of whom were interviewed. The decision was made to hire the defendant Dr. Holton. The parties contend that there is a dispute as to who actually hired Dr. Holton, but Dr. Holton has admitted, in her report, that the Diaconate voted to hire her and indeed did so.[2]
The parties disagree as to whether the process which ensued can be termed “mediation” but the steps taken by the defendant in this process are not in serious dispute. The defendant interviewed more than one hundred members of the congregation, solicited written letters and comments and spoke with members of the Diaconate and Rev. White. On February 20, 1992 Dr. Holton presented a draft of her report to Rev. White, Rev. Harper, and Ann Ahnlin, the Church’s moderator. The report was highly critical of Rev. *215 White’s ministry and concluded that “It is clear to me that Rev. White does not now have, and cannot have a successful ministry at the First Congregational Church in Melrose.” The parties disagree as to the exact tone of the meeting: Rev. White contends that he was presented with the report as a final draft whereas Dr. Holton asserts that the meeting was held so that Rev. White would have time to make suggestions concerning the final draft of the report. The resolution of this factual dispute, however, is not dispositive for the purposes of this motion.
Hundreds of copies of Dr. Holton’s report were prepared and made available to congregation members at a February 22, 1992 meeting of the Church. At this meeting, Dr. Holton made an oral presentation to the Church concerning the findings contained in her report. The meeting was videotaped by a member of the congregation. For a period of time following the meeting, copies of the Report were also available in the Church’s office and at least one copy of the report found its way to a local newspaper reporter.
Following issuance of the report, Rev. White resigned his post claiming that the report had made it impossible for him to continue as senior minister of the Church. Rev. White alleges that the report contained numerous defamatory statements about him and has brought this action seeking to recover for defamation (Count I) and the intentional interference with a contractual relationship (Count II). Additionally, Caroline White has stated a claim for loss of consortium (Count III). Dr. Holton has moved for summary judgment on all counts.
DISCUSSION
I. Jurisdiction
It is important to address, as a threshold issue, whether or not this court has subject matter jurisdiction over the present case and, if so, if it is appropriate to exercise such jurisdiction. The defendant has argued that the court lacks jurisdiction because the case essentially involves a religious issue and is therefore non-justiciable. It is well settled that “[cjourts cannot question the veracity of religious doctrines or beliefs,” Madsen v. Erwin, 395 Mass. 715, 722 (1985) (citing United States v. Ballard, 322 U.S. 78, 86 (1944)) and that “a court must defer to the Church in matters of ecclesiastical decisions.” Id. (citations omitted). It is equally true, however, that “the rights of religion are not beyond the reach of civil law.” Madsen at 726.
In support of her contention that the court should not assume jurisdiction in this case, defendant cites Antioch Temple, Inc. v. Parekh, 383 Mass. 854 (1981). In Antioch Temple, the court reviewed a dispute concerning both church property and the firing of the church’s pastor. As the defendant notes, the Antioch Temple court stressed that “in determining whether and to what extent civil courts must refrain from involving themselves in controversies concerning religious organizations, both this court and the United States Supreme Court have distinguished between hierarchical and congregational church structures.” Id. at 860.[3] The defendant further argues that because the First Congregational Church of Melrose is a congregational church, the court should give effect to authoritative resolutions by the Church’s governing body. (Citing to Antioch Temple at 860.) In short, the defendant argues that this court should not hear the present action — either because it does not have jurisdiction or because it must defer to the Diaconate of the church in its decision to fire Reverend White.
In the present case, however, the determination of the Church’s structure is of little moment and the holding of Antioch Temple inapplicable on the facts presented.[4] If this were a case in which the plaintiff was attempting to bring an action against the Church alleging that his termination was improper, Antioch Temple would undoubtedly apply. Additionally, U.S. Supreme Court cases have held that “the assessment of an individual’s qualifications to be a minister, and the appointment and retirement of ministers, are ecclesiastical matters entitled to constitutional protection against judicial or other state interference.” Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church, 344 U.S. 94, 116 (1952).
In the case at bar, however, no such question is presented. This is not a case concerning the propriety of retaining or not retaining Rev. White. Instead, the present suit involves claims against an outside consultant brought in by the Diaconate to mediate a dispute. Dr. Holton is not the Church nor is the Church Dr. Holton. Even if it were inappropriate for this court to hear a case against the church or its governing body, it is not inappropriate to hear an action brought against a consultant hired by the church. As the court stated in Marsden, supra:
It is clear that “[n]ot every enterprise cloaking itself in the name of religion can claim the constitutional protection conferred by that status” (citations omitted). “[N]ot every endeavor that is affiliated, however tenuously, with a recognized religious body may qualify as a recognized religious activity of that body and come within the scope of the protection from governmental involvement that is afforded by the first amendment.”
Id. at 722, n.2.
Such is the case here. The defendant impliedly argues that the church had delegated its decision-making power to her by hiring her to mediate the present dispute and that this case therefore is a non-justiciable religious matter. The court is not aware of any case which stretches First Amendment protections to this extent and it is unwilling to be the first to do so.
Finally, even if Dr. Holton were to be afforded some of the protections that the First Amendment affords the church, it is important to note that “(t]he First *216 Amendment religious provisions contain two concepts, ‘freedom to believe and freedom to act. The first is absolute, but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.’ ” Marsden, 395 Mass. at 727 (citing Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940)). Specifically, the court noted that even “a clergyman may not with impunity defame a person ... or commit other torts. The torts of which [the plaintiff] complains are conduct and hence, they are subject to regulation.” Similarly, the acts alleged in the present case are conduct and subject to judicial review.
II.Summary Judgment Standard
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to a judgment as a matter of law." Pederson v. Time, Inc., 404 Mass. 14, 16-17(1989).
A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
III.G.L.c. 233, §23C
Defendant argues that summary judgment must be granted because the present action is barred by G.L.c. 233, §23C which deals with the confidentiality of a mediator’s work product.[5]
Even if §23C were applicable to the present case, the section itself serves only as an evidentiary rule, not as a bar to an entire action. Section 23C makes certain communications with a mediator inadmissible at trial much like settlement negotiations are inadmissible at trial. Reading the defendant’s motion liberally, one might assume that the defendant’s argument is that all of the communications with Holton fall under §23C and therefore the plaintiff has no hope of producing any evidence at trial. Assuming that this is the defendant’s argument, it still must fail because the defendant fails to meet the requirements of the statute and because the service eventually rendered simply was not mediation.
For §23C to apply, the mediator must enter into a written agreement with the parties in which the parties agree to have the mediator resolve their disputes. In the present case, no such written agreement exists. The defendant argues that certain letters sent to members of the congregation and signed by Rev. White, when considered with a letter from Dr. Holton to Rev. White indicates that an agreement existed. This may indeed be true however, the requirements of §23C are clear: There must be a written agreement between the parties agreeing to the mediation. In the present case, the parties to the agreement would be Rev. White, Dr. Holton and the members of the Diaconate. No such agreement existed nor are the above-mentioned letters a substitute for the statutory requirements.
Additionally, §23C requires that a mediator have completed 30 hours of mediation training. Dr. Holton does not argue that she has had specific mediation training but instead that the court should accept Dr Holton’s “hundreds of hours of training ... in conflict management” as a reasonable substitute. I decline to do so.
“Conflict management” is a broad term which can apply to any number of alternative dispute resolution techniques. Conflict management training may include mediation training but then again, may not. It is significant that despite numerous opportunities to do so — in her motion for summary judgment, reply memorandum and at oral argument — the defendant has never said that she received the requisite 30 hours of training in mediation. For this reason as well, defendant’s argument must fail.
Finally, it is important to note that even if the defendant were able to qualify as a mediator and even if a written agreement had been entered into, it is doubtful that the public policy concerns that motivated §23C would extend to a publication of findings such as the one that took place in this case. Mediation, by its very nature, is a confidential process. Section 23C was designed to facilitate this confidentiality much in the same manner that settlement negotiations are protected. The widespread publication of a report seems to run afoul of the concern for confidentiality and would likely not fall under the ambit of §23C.
IV.Immunity
Defendant next argues that she is entitled to absolute quasi-judicial immunity for her work as a mediator. In support of this contention, defendant cites a number of cases where arbitrators, conciliators and others performing dispute resolution services have been afforded quasi-judicial immunity. In all of the cases cited, however, the party afforded immunity was working at the direction of the court. “Courts have expanded the doctrine of absolute judicial immunity to include these ‘quasi judicial’ officers because they are involved in an integral part of the judicial process and thus must be able to act freely without the threat of a law suit.” LaLonde v. Eissner, 405 Mass. 207, 210 (1989) (citation omitted). As LaLonde clearly notes, however, this immunity has only been extended to officers acting “at a judge’s direction.” Id. at 211. Defendant cites no case, and this court is aware of no *217 case, where quasi-judicial immunity has been extended to a private party not working at the behest of the court. For this reason, Dr. Holton is not protected by quasi-judicial immunity.
V. Count I — Defamation
A.Publication
With respect to the defamation count, the defendant’s first argument is that summary judgment must be granted because there was no publication of the allegedly defamatory statements. In order to maintain an action for defamation, a plaintiff must show that the defamatory statement was communicated to a third party. Comerford v. West End St. Ry. Co., 164 Mass. 13 (1895). However, “[t]here is no requirement in an action of libel that the defamatory matter be communicated to a large or even substantial group of persons. It is enough that it is communicated to a single individual other than the one defamed.” Brauer v. Globe Newspaper Co., 351 Mass. 53, 56 (1966) (citations omitted). In the present case, by all accounts, hundreds of copies of Dr. Holton’s report were prepared for distribution to Church members. Additionally, Dr. Holton made an oral presentation to members of the church. This presentation was videotaped, though the parties disagree as to who initiated the videotaping. Additionally, copies of the report were available at the Church office for a period of time following the presentation and at least one copy found its way to a local newspaper reporter. The defendant, however, argues that since she was, in essence, hired by the entire congregation, and her communication was “limited” to the entire congregation, there was no publication to a “third person.” Factually, this is incorrect. According to the defendant’s own report, it was the governing body of the Church, the Diaconate, who hired her to mediate the current dispute. (Report, p.l “I agreed to come to the church ... to meet the minister and the Diaconate. The Diaconate voted to ask me to work with them; 1 accepted the consultation with the Church.”) Given the widespread dissemination of Dr. Holton’s report to members of the congregation who were not part of the Diaconate, it would be impossible to say that no publication took place. In light of the foregoing facts, the argument that there was no publication to a third person fails the test of common sense.
B.Immunity and Privilege
Defendant next makes a number of arguments concerning immunities and privileges.[6] The defendant cites a number of cases which illustrate the proposition that public officials performing their public duties enjoy absolute immunity from a defamation suit. Likewise, the plaintiff also cites a number of cases that hold that a newspaper publisher is privileged in publishing fair accounts of judicial proceedings. While the cases cited are a correct statement of the law, they are also irrelevant. In the case at bar, the defendant is not a public official performing a public duty nor was her report a fair account of a judicial proceeding. The defendant asks the court to extend her a similar immunity arguing that her role as a mediator was analogous to that of a public official performing a public duty and that her report is analogous to a fair account of a judicial proceeding. Again, the defendant cites no case that has extended this immunity to include a private party not acting at the direction of the court and, again, I decline to do so here.[7]
C.Opinion v. Fact
Defendant next argues that the statements contained within her report are not actionable since they expressed only opinion rather than fact. “Statements of fact may expose their authors or publishers to liability for defamation, but statements of pure opinion cannot.” King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987). “The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion.” Id. at 709 (citations omitted). In the case at bar, the plaintiff claims to have been defamed by numerous statements contained within the defendant’s report including allegations that he violated the confidences of members of his congregation. There can be no question that such allegations are stated not as opinion but as fact in Dr. Holton’s report.[8]
Additionally, both parties have spent considerable time arguing about whether Dr. Holton's statement that “Rev. White does not now have, and cannot have a successful ministry at the First Congregational Church in Melrose” is a statement of fact or opinion. Observed in isolation, the statement appears to be one of pure opinion; taken in context of the rest of the report — which is made up almost entirely of factual assertions — the statement could be considered a factual assertion. ”[T]he determination whether a statement is a factual assertion or is a statement of pure opinion is a question of fact if the statement reasonably can be understood both ways.” King, 400 Mass, at 709. Defendant is therefore not entitled to summary judgment on this point for two reasons: The numerous statements of fact contained within the report are actionable as a matter of law, and, the one questionable statement concerning the viability of Rev. White’s ministry presents a factual question for the jury.
D.Republication
The defendant next contends that the statements of fact within the report are not actionable because they amount to nothing more than a collection of statements made by others which the defendant simply reprinted. To the extent that the report repeats allegations made by others, these statements are still actionable. Generally, “the republisher of a defamatory statement ‘is subject to liability as if he had originally published it.’ ” Jones v. Taibbi, 400 Mass 786, 792 (1987) (citations omitted). “Liability for a defamatory statement may not be avoided merely [by] *218 adding a truthful preface that someone else has so stated.” Id. (citations omitted).
E. Public Figure or Public Controversy
Finally, defendant claims that Rev. White is either a public figure or a public figure for the purpose of this controversy and that summary judgment is appropriate because the plaintiffs have made no showing of actual malice.[9] Where the facts bearing on the plaintiffs status are uncontested, the determination of whether the plaintiff is a public figure is a question of law to be answered by the court. Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 862-63 (1975). It is rare that a plaintiff will be considered a public figure for all purposes. Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52 (1983) (“[w]e would not lightly assume that a citizen’s participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life”). In the case at bar, Rev. White cannot be said to enjoy the advantages usually enjoyed by public figures, i.e. “greater access to the channels of effective communication and hence a more realistic opportunity to counteract false statements.” Stone at 859 (citing Gertz, supra). Rev. White cannot, therefore, be considered a general public figure.
More commonly, though, a plaintiff can become a public figure for a limited range of issues. Gertz at 351-52. When a private individual “voluntarily injects himself or is drawn into a public controversy, [he] thereby becomes a public figure for a limited range of issues.” Materia v. Huff, 394 Mass 328, 331 (1985) (citing Gertz at 352); Stone, supra, at 866; Lyons, supra, at 54-55. In the case at bar, the defendant argues that Rev. White voluntarily injected himself into the present controversy by requesting mediation of his dispute with the Church. I disagree. “In determining the plaintiffs status as a limited issue public figure, [the] court must look ‘to the nature and extent of an individual’s participation in the particular controversy giving rise to the defamation.’ ” Jones v. Taibbi, 400 Mass. 786, 798 (1987) (citing Gertz, supra, at 352; Hutchinson v. Proxmire, 443 U.S. 111, 134-36 (1979); Wolston v. Reader’s Digest Ass’n, 443 U.S. 157, 166-69 (1979)).
However, not every action by a plaintiff constitutes an attempt to “thrust [himself or] herself to the forefront of [a] particular public controversy in order to influence the resolution of the issues involved in it." Time, Inc. v. Firestone, 424 U.S. 448, 453 (1975). In Time, Inc., for example, the court held that the wife of a rich socialite did not thrust herself into a public controversy by filing for divorce from her husband. The court reasoned that the plaintiffs filing for divorce could not lead to the conclusion that she freely chose to publicize her private life. Id.
While the precise factual circumstances involved here have not been presented in any previous Massachusetts cases, two cases from other jurisdictions are particularly on point. Daniels v. Church of God in Kansas, 1990 Kan. App. LEXIS 245; Davis v. Keystone Printing Service, Inc., 507 N.E.2d 1358 (Ill.App. 2 Dist. 1987). In Daniels, the plaintiff, a Reverend who had hoped to be appointed to lead the Glenn Street Church of God, claimed he was defamed by two other Reverends of his faith who made disparaging comments about him to congregants of the Glenn Street Church. There, the court held that even within the context of the congregation, the plaintiff could not be considered a limited public figure since there was no “public controversy into which he has thrust himself in an attempt to influence the resulting decision.” Daniels, at p.5.
In Davis, the plaintiff, in addition to his status as a Reverend, was president of a tax-exempt religious organization which assisted members of the Navy who had addiction problems, had sung on national television and radio, and had often been photographed with prominent politicians. Still, the Davis court held that the plaintiff was not a limited public figure for purposes of a defamation suit where the defendants had published a series of articles accusing the plaintiff of luring congregants into homosexual encounters, advocating illegal absences from the U.S. Navy and encouraging large personal donations. There, the court noted that it did “not believe [that the plaintiffs] involvement in religion is equivalent to injecting himself into a public controversy . . .” Id. at 1364.
Similarly, in the case at bar, neither the plaintiffs position as Reverend of the Church nor his request for mediation can be construed as an attempt to inject himself into a public controversy. Additionally, there is a serious question as to how “public” this public controversy actually was. A public controversy should be evaluated in relation to the particular community in question as opposed to the world at large. Materia, 394 Mass, at 331. Even so, according to Dr. Holton’s own report, a full third of the congregation was either unaware of the controversy or had no feelings about it. (Dr. Holton’s Report, p. 38). A controversy does not become a “public controversy” simply by virtue of its interest to a portion of the public. Time, Inc. at 454. For these reasons, Rev. White can not be considered either a public figure or a public figure for the limited issues of this controversy. Accordingly, summary judgment on this point is not appropriate.[10]
For the reasons stated hereinabove, the defendant’s motion for summary judgment on Count I of the complaint is DENIED.
VI. Count II. — Intentional Interference With a Contractual Relationship
Count Two of the plaintiffs' complaint alleges an intentional interference with a contractual relationship. A claim for such interference has long been *219 recognized within the Commonwealth. Owen v. Williams, 322 Mass. 356, 362 (1948). To succeed on a claim for intentional interference with a contractual relationship, the plaintiff must prove:
1. the existence of the contract,
2. that the defendant knowingly interfered with the contract,
3. that the defendant’s interference, in addition to being intentional, was improper in motive or means, and;
4. that the plaintiff was harmed by the defendant’s activities.
Wright v. Sherman Hospital for Crippled Children, 412 Mass. 469, 476 (1992): G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass 262, 272 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-17 (1990).
Dr. Holton moves for summary judgment on this count asserting that no “malice” has been shown by the plaintiff and that the plaintiff has failed to show that he was harmed by the interference. Additionally, Dr. Holton claims that her communications were privileged.
The Supreme Judicial Court adopted the word “improper” in Geltman, supra, rejecting early cases which had sporadically used words such as “malicious” or “ill will” to define the necessary level of interference. See Geltman at 814-15 and cases cited therein. In adopting the word “improper,” the Court noted that “[a]lthough we now abandon the word malicious in the description of any element of these torts, we affirm our recent statement that something more than intentional interference is required.” Geltman at 815.
It is clear in light of Geltman that a showing of improper means or motive, rather than ill will or “malice,” is an essential element of the plaintiffs prima facie case. In the present case, the plaintiff has presented evidence which, if believed by a factfinder, would allow a reasonable jury to conclude that the defendant used an improper means, specifically, excessive publication of her report.
Defendant has also claimed that she is entitled to summary judgment on Count II because the plaintiff will be unable to prove that the interference caused the plaintiff any damages. In short, the defendant points out that the Diaconate was free to fire Rev. White at any time and, indeed, had asked for his resignation prior to the her involvement in the matter. To an extent, the defendant is correct: Given the facts in the case, the plaintiff may have a difficult time in proving that he was injured by the defendant’s interference. However, as the plaintiff notes, his contract was still in effect at the time the defendant became involved in the controversy. The court cannot, therefore, conclude as a matter of law that a reasonable jury could not find that the plaintiff was injured as a result of the defendant’s interference. Summary judgment would therefore be inappropriate on this point.
Finally, the defendant has claimed that she is entitled to summary judgment on Count II because her statements were privileged. “Massachusetts courts have recognized that a person may possess a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest.” Bratt v. International Business Machines Corp., 392 Mass. 508, 512-13 (1984) (citations omitted). The court has also “recognized that there is a qualified, or conditional, privilege ‘where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it.’ ” Id. at 513, n.8 (citations omitted). Using this test, it is clear that, as a matter of law, Dr. Holton was entitled to a conditional privilege with respect to communications between herself and the Diaconate. Dr. Holton and the Diaconate shared the common interest of determining the causes of friction between Rev. White and certain members of the congregation as well as the possible solutions to such problems. This privilege is similar to the one enjoyed by employers and former employers who furnish useful information about employees and former employees. See, for example, Bratt at 516-17 and cases cited therein.
Once a conditional privilege is shown to exist, the burden shifts to the plaintiff to show that the privilege was abused and thereby lost. Foley v. Polaroid Corp., 400 Mass. 82, 85 (1982). A conditional privilege of this sort can be abused if the publication was unnecessary, unreasonable or excessive. Bratt, supra, at 513. Proof of actual malice is not required. Id. at 513 (citing Galvin v. New York, N.H.&H.R.R., 341 Mass. 293, 297-98 (1960)). As I noted earlier in this decision, Dr. Holton was hired by the Diaconate to negotiate a dispute between the governing body and Rev. White. For that reason, her communications with the Diaco-nate were conditionally privileged. The same cannot be said, however, about her publication to the entire Church congregation. Even though members of the congregation may have been interested in the outcome of the “mediation,” they did not have a legitimate business interest in possessing such information. Publication to a third party not covered by the conditional privilege is deemed to be excessive unless it is merely “incidental” or the plaintiff reasonably believed that the publication was a “proper means of communicating the matter to a privileged person.” Bratt, supra, at 515. Here, publication to the congregation was clearly not incidental. Likewise, no reasonable jury could conclude that Dr. Holton reasonably believed that publication of the report to the entire congregation was the proper means for communicating with the Diaconate. I conclude, therefore, that as a matter of law Dr. Holton’s communications with the Diaconate were protected by a conditional privilege but that Dr. Holton abused that privilege through excessive, unreasonable and unnecessary publica *220 tion. For the reasons stated hereinabove, the defendant’s motion for summaiy judgment on Count II of the complaint is DENIED.
VII. Loss of Consortium Claim
Finally, defendant moves for summary judgment on Count III of the plaintiffs’ complaint which alleges a loss of consortium as a result of the actions alleged in Counts I and II. Defendant bases her motion on the premise that Counts I and II should be dismissed and that the consortium claim would not stand on its own. Since Counts I and II of the complaint survive this motion for summary judgment, however, Count III will survive as well.
It has long been recognized in the Commonwealth that either spouse may maintain a claim for loss of consortium based on a loss of companionship, affection and sexual enjoyment of one’s spouse. Diaz v. Eli Lilly & Co., 364 Mass. 153 (1973); Agis v. Howard Johnson Co., 371 Mass. 140 (1976). Additionally, a claim for loss of consortium need not be based on a physical injury to either spouse. Agis, supra, at 146 (“[t]he question before us is whether an action for loss of consortium can be maintained where the acts complained of are intentional, and where the injuries to the spouse are emotional rather than physical. [T|he fact that there is no physical injury should not bar the plaintiffs claim”). As the Agis court noted, “[T]he underlying purpose of such an action is to compensate for the loss of companionship, affection and sexual enjoyment of one’s spouse, and it is clear that these can be lost as a result of psychological or emotional injury as well as from physical harm.” In the case at bar, if the plaintiff can prove the allegations contained in Counts I or II, there may be a viable claim for loss of consortium. For the reasons stated hereinabove, the defendant’s motion for summaiy judgment on Count III is DENIED.
ORDER
For the reasons stated hereinabove, the defendant’s motion for summaiy judgment is DENIED.

 The parties were heard at oral argument concerning this motion. Following oral argument, the defendants supplemented their motion with a letter suggesting that the case be dismissed pursuant to Mass.R.Civ.P. 12(b) (2) for lack of subject matter jurisdiction. Because ofthenature of this case, it is appropriate to address the question of jurisdiction and I do so below. To the extent that the defendant’s letter constituted a formal motion to dismiss, that motion is likewise DENIED for the reasons outlined below.

 See, Report to the First Congregational Church of Melrose, February 22, 1992 (the “Report”), Page 1.

 According to the Antioch Temple court, a congregational church is one in which the local church is self-governing, id. at 860, and a hierarchical church is one where the local church is but a subordinate member of a larger, general church organization, id. at 861.

 It should be noted that even if Antioch Temple were applicable to the present case, the holding of Antioch Temple would not dictate a different result. As the Court noted in that case, it is “in disputes involving hierarchical churches that the civil courts must tread more cautiously . . .’’ Id. at 861. The general holding of the Antioch Temple court reinforces the idea that a civil court may exercise jurisdiction over a dispute involving a congregational church, id. at 864.

 Section 23C provides:
All memoranda, and other work product prepared by a mediator and a mediator’s case files shall be confidential and not subject to disclosure in any judicial or administrative proceeding involving any of the parties to which such materials apply. Any communication made in the course of and relating to the subject matter of any mediation and which is made in the presence of such mediator by any participant, mediator or other person shall be a confidential communication and not subject to disclosure in any judicial or administrative proceeding; provided, however, that the provisions of this section shall not apply to the mediation of labor disputes.
For the purposes of this section, a “mediator" shall mean any person not a party to a dispute who enters into a written agreement with the parties to assist them in resolving their disputes and has completed at least thirty hours of training in mediation and who either has four years of professional experience as a mediator or is accountable to a dispute resolution organization which has been in existence for at least three years or one who has been appointed to mediate by a judicial or governmental body.

 Defendant’s arguments concerning immunities and privileges are somewhat confusing. In her motion for summary judgment defendant asserts that she is entitled to an absolute privilege analogous to the one afforded public officials performing official duties and newspaper publishers reporting on judicial proceedings. (Defendant’s motion to dismiss, p. 12.) In her reply memorandum, however, the defendant says that she does not contend that she has an absolute immunity but rather a qualified immunity. (Defendant’s reply memorandum, p. 15.) In either case, defendant’s argument is unavailing.

 Defendant has not specifically argued that she is entitled to a conditional privilege with respect to the publication of defamatory material where there is shared a common business interest with the third party. Defendant has, however, made this argument with respect to plaintiffs claim of intentional interference with a contractual relationship. As is discussed in greater detail below, the defendant is indeed entitled to such a privilege. However, since the plaintiff has, as a matter of law, abused this privilege, summary judgment is inappropriate on this point.

 Dr. Holton’s report contained, among others, the following statements of fact on the issue of confidentiality:
“One congregant wrote a personal and confidential letter to Rev. White; he photocopied it and gave it to another parishioner.”
“I was witness to a few instances of Rev. White’s denigrating some congregants in a public forum.”
“Some specific examples include an instance where a congregant told Rev. White something in confidence and it was brought up in worship on Sunday morning.”

 Private individuals need show only that a defamation was negligent whereas public figures must prove actual malice. ELM Medical Laboratory, Inc. v. RKO General Inc., 403 Mass. 779 (1989); Lyons v. New Mass Media, Inc., 390 Mass 51 (1983); Stone v. Essex County Newspapers, Inc., 367 Mass. 849 (1975); Gertz v. Robert Welch Inc., 418 U.S. 323, 342 (1974).

 Both the U.S. Supreme Court and the SJC have noted that “(h)ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare.” Jones v. Taibbi, 400 Mass. 786, 799 (1987) (citing Gertz, supra, at 345). Such a situation is not presented here.