# Illinois Official Reports

## Appellate Court

---

### *Jacobson v. CBS Broadcasting, Inc.*, 2014 IL App (1st) 132480

---

| | |
|---|---|
| Appellate Court Caption | AMY JACOBSON, Plaintiff-Appellant, v. CBS BROADCASTING, INC., Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-13-2480 |
| Filed | September 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered against plaintiff television news reporter in her seven-count complaint against a competing television broadcaster, including allegations of intrusion upon seclusion, false light, defamation of character, and intentional infliction of emotional distress, based on the videotaping of her and her young children around the backyard pool at the home of a man who was the center of a controversial news story involving the disappearance of his wife, since plaintiff was a public figure under the "limited purpose" classification set forth in *Gertz* based on her participation in the controversial news story that led to defendant's alleged defamation, but she failed to establish a triable issue that defendant edited and broadcast the videotape with actual malice by intentionally publishing a false report about defendant's conduct in attempting to get information related to the disappearance of the man's wife, especially when the videotaped activities were readily visible from areas around the man's property, which was subject to near constant observation by law enforcement officers and the media. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-7331; the Hon. Jeffrey Lawrence and the Hon. Elizabeth M. Budzinski, Judges, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Kathleen Zellner and Douglas H. Johnson, both of Kathleen Zellner &
Associates, P.C., of Downers Grove, for appellant.

Brian A. Sher and Jena M. Valdetero, both of Bryan Cave LLP, of
Chicago, and Lee Levine, *pro hac vice*, Jay Ward Brown, *pro hac vice*,
and Matthew E. Kelley, *pro hac vice*, all of Levine, Sullivan, Koch &
Schulz, LLP, of Washington, D.C., for appellee.

Panel

JUSTICE HOFFMAN delivered the judgment of the court, with
opinion.
Justices Hall and Rochford concurred in the judgment and opinion.

## OPINION

¶ 1    The plaintiff, news reporter Amy Jacobson, filed suit against the defendant, CBS
Broadcasting, Inc. (CBS), for damages arising from a videotape made of her and her two
young children while they were swimming in the backyard pool of a high-profile source in a
story upon which the plaintiff was reporting. The seven-count, fifth-amended complaint
(complaint) asserted claims for intrusion upon seclusion, false light, intentional infliction of
emotional distress, defamation of character, and tortious interference with a business
relationship and business expectation. After two separate proceedings, the circuit court granted
summary judgment for CBS under section 2-1005 of the Code of Civil Procedure (735 ILCS
5/2-1005 (West 2010)), as to all seven counts, and the plaintiff now appeals, raising the
following issues: (1) the court erred in finding her to be a public figure, and thus required to
prove actual malice in her claims for defamation; (2) even assuming she is a public figure, she
raised a triable issue of fact as to the existence of actual malice; (3) summary dismissal of her
false light claim similarly was error because a triable issue of fact exists as to actual malice; (4)
the court erred in summarily dismissing her claim for intrusion upon seclusion because she
sufficiently demonstrated that CBS recorded private facts at a time when she had a reasonable
expectation of privacy; and (5) the court erred in summarily dismissing her emotional distress
and tortious interference claims as being merely derivative of her defamation claims. For the
reasons that follow, we affirm the judgment of the circuit court.

¶ 2    As this case is on review from a grant of summary judgment for CBS, we recite the facts in
a manner consistent with this procedural posture, construing the evidence most favorably to
the plaintiff. At the time of the occurrence, the plaintiff had been employed for 11 years as a
reporter for Chicago television station WMAQ, NBC-5. She was assigned to report on the case
of Lisa Stebic, who, on April 30, 2007, vanished from the Plainfield home she shared with her
husband, Craig Stebic (hereinafter Stebic house). At the time of Lisa's disappearance, she and
Craig were in the midst of a contentious divorce, and the ensuing disappearance became the
focus of media attention.

¶ 3    From the moment the plaintiff was assigned to the case, she developed a rapport with the families of both Lisa and Craig Stebic. On July 6, 2007, the plaintiff was invited to the Stebic house by Craig's sister, Jill Webb, to discuss the case. While she was there, she was videotaped from a neighbor's home, allegedly by Michael Puccinelli, a reporter from CBS's local station, CBS-2, and his cameraman, Nathan Delack. At the time, CBS and NBC were competitors locked in an intense battle for ratings. Excerpts of the videotape were subsequently aired by CBS in the context of a news report, after which the plaintiff was terminated from NBC and subjected to criticism over her journalistic ethics. The plaintiff claimed that the taping and the broadcast violated her right to privacy, were defamatory, and caused her to be fired by NBC-5. In particular, she alleged that the edited version of the videotape as broadcast maliciously placed her in a false light and intentionally sought to portray her "as an adulteress and an unethical reporter."

¶ 4    In her deposition, the plaintiff testified that the morning of July 6, 2007, was her day off, and she had planned to go swimming with her two young sons, ages two and three, at a health club near her home. On the way to the health club, however, she received a call from Jill inviting her to come to the Stebic house. Not wanting to miss out on a potential lead and a chance to "get the story," the plaintiff decided to proceed with the boys to the Stebics', which had a backyard swimming pool. The plaintiff arrived at the house around 11 or 11:30 a.m., at which point her children immediately went into the pool. The plaintiff removed her shirt and shorts and accompanied the boys into the water. Present at the home with the plaintiff were Craig Stebic, Jill, Jill's husband Robert Webb, and the Webbs' children, who were visiting from out of town. The plaintiff denied being aware at the time she arrived at the Stebics' that there were any other reporters or news media in the surrounding area. However, she acknowledged learning that day that there were in fact other camera crews and news personnel present in the neighborhood, including Puccinelli and Delack. Nonetheless, the plaintiff testified that she never gave anyone permission to record her in any manner and that she believed she was in a private area when she and her boys were at the Stebic house.

¶ 5    That same morning, Puccinelli and Delack went to the Stebic house on assignment from CBS in an attempt to interview Craig Stebic regarding a large public search for Lisa that was scheduled for July 7. When Puccinelli knocked on the Stebics' front door, Robert Webb responded and told him that no one from the family would be making any comment. Webb testified that, at that point, Puccinelli appeared upset and left the premises. After leaving, Puccinelli and Delack proceeded to the home of neighbors, Tracy Reardon and William Ahlstrom, who lived behind the Stebics, and with whom Puccinelli had developed a professional relationship during Lisa's case. Reardon and Ahlstrom invited Puccinelli into their home, and from the kitchen window, Puccinelli observed what he described in his deposition as a social gathering in the Stebics' backyard. According to Puccinelli's testimony, he was able to recognize both the plaintiff and Craig Stebic. Puccinelli was then allowed by the neighbors to bring Delack into the home with his camera, at which time Delack filmed the footage which became the subject of this case.

¶ 6    After obtaining the footage, Puccinelli returned to the Stebic house and recorded the license plate number of a vehicle parked in front of the house. He conducted a search which confirmed that the vehicle belonged to the plaintiff. Puccinelli then notified CBS's news director, Carol Fowler, who instructed him to transmit the videotape into the station. The

plaintiff testified that copies of the tape immediately made their way around the editing "bays" at CBS. However, CBS did not immediately air the story.

¶ 7    Later that afternoon, after the plaintiff left the house, she contacted her supervisor at NBC and informed him that she had been videotaped swimming at the Stebic house. Her supervisor expressed displeasure and subsequently instructed her not to report for her next scheduled shift on Sunday and to retain an attorney. The following Monday, July 9, 2007, a meeting was held between the plaintiff and her supervisors, during which the plaintiff expressed regret for her decision to go to the Stebic house with her children.

¶ 8    In the meantime, on July 9, Fowler had been informed that two local newspapers were aware of the plaintiff's presence at the Stebic house the previous Friday and that executives at NBC were very displeased with her conduct in covering the Stebic case. Fowler stated in one email that CBS nonetheless would wait to air the videotape until after the newspapers broke the story, but that the tape was nonetheless CBS's exclusive story and should be released by them. CBS then proceeded in its efforts to prepare the planned broadcast.

¶ 9    On the evening of July 9, both the *Chicago Tribune* and the *Chicago Sun-Times* published, in print and on their websites, the story of the plaintiff's presence at the Stebic house, and NBC's adverse reaction to it. The *Sun-Times* story, under the headline and byline "In too deep *** pool party with missing woman's husband could sink Channel 5 reporter," stated that the plaintiff was in trouble with her bosses for "going swimming on her day off with the estranged husband of a missing Plainfield woman." The *Tribune* story similarly reported that the plaintiff had been "seen on video tape with her children at a backyard pool-side get-together," and that her WMAQ superiors were evaluating whether an ethical line had been breached and if punishment was warranted for her actions.

¶ 10   On July 10, 2007, CBS broadcast the report in its early morning news. In its original form, the videotape footage had covered a time span of roughly 16 minutes and contained images of the plaintiff, Jill Webb, Craig Stebic, and the children, engaging in different activities at various times in the pool area. It depicted the plaintiff in her halter swimsuit top and a towel, primarily walking in and out of the sliding door of the pool area, talking on her cell phone. The news report, however, featured an edited version lasting approximately two minutes, portions of which were juxtaposed with commentary of CBS reporter, Alita Guillen.

¶ 11   In the broadcast version, which was shot from a distance and is somewhat blurry, the plaintiff is seen initially in her swimsuit top and towel standing inside the open sliding door of the backyard, talking on her cell phone. The tape then cuts to Craig, who is behind the fence in another area of the yard, putting a T-shirt over his bare upper body, then immediately to the plaintiff's children. The tape shows an image of the front of the Stebic house, and shortly thereafter, another image of the plaintiff carrying items from the house through the sliding door. Finally, Craig Stebic is again depicted shirtless behind the fence, walking back and forth. The verbal broadcast consists of an introduction followed by a showing of the edited tape, after which Guillen consults with Michele Weldon, a journalism professor from Northwestern University, regarding her views on the ethics of the plaintiff's conduct. The text of the broadcast is set forth as follows:

> "DERRICK BLAKELY: This morning a Chicago television reporter is in hot water over her technique in pursuing a source in the disappearance of Lisa Stebic. Stebic was last seen by her husband Craig Stebic two months ago. He's not talking to police, but

appears to be spending time with a local reporter. CBS-2's Alita Guillen has the exclusive pictures.

ALITA GUILLEN: This video shows [the plaintiff] wearing a bikini and wrapped in a towel at Craig Stebic's home, the man who police say last saw his missing wife nearly two months ago. Also seen in this video, captured Friday, is Craig Stebic, his sister ***, and [the plaintiff's] two children. We shared the video with journalism professor Michele Weldon.

MICHELLE WELDON: I mean, clearly this is a conflict of interest.

GUILLEN: A case, she says, of gravely crossing a journalistic line, an error in judgment that damages [the plaintiff's] credibility, as well as her colleagues'.

WELDON: It's going to make the audience question, and her colleagues, and her competitors, question, what else has she done?

GUILLEN: Neighbors tell CBS-2 that [the plaintiff] has been visiting Stebic's home frequently since his estranged wife's disappearance. Why she's been there is unclear. Though she's covered the story, she's never mentioned her social relationship with Stebic or his family.

WELDON: To quote from the SPJ Code of Ethics, they say 'Remain free of associations and activities that may compromise integrity or damage credibility.'

GUILLEN: Monday NBC-5 released this statement saying, 'The matter is still under review, and that is the only comment we'll make.'

WELDON: I would use this as an example to my students, this is not the right thing to do. This is something to avoid.

GUILLEN: We did try to contact [the plaintiff], but were unable to reach her."

¶ 12    Later in the afternoon of July 10, NBC announced that it was terminating the plaintiff's employment. In the days following the broadcast, there was a significant public outcry both regarding the videotape's content and CBS's conduct in airing it. Fowler admitted receiving many critical emails from the public expressing that CBS had acted improperly, to a point where she felt the need prepare a statement justifying the network's actions. On July 11, CBS made the decision to release the entire unedited videotape, with the children's identities concealed, in the interests of "full disclosure."

¶ 13    There was also a large amount of public outrage directed at the plaintiff's actions as presented in the videotape. Her journalistic ethics, judgment and objectivity sparked commentary and debate among members of the public as well as established members of the news media. The plaintiff acknowledged that, in the days and weeks following the release of the tape, she was pursued by many local and national news outlets and media personalities, including Matt Lauer, Larry King, Diane Sawyer and Wolf Blitzer, seeking her side of the story. However, perceiving that she had made an "error in judgment" and may have stepped "over the line" by going to the Stebics' that day, she chose to grant interviews only to select local sources and figures, with which she could be given an opportunity to fully present her side of the story without interruption.

¶ 14    In her complaint, the plaintiff alleged the following causes of action: invasion of privacy by intrusion upon seclusion (count I); false light (count II); intentional infliction of emotional distress (count III); defamation *per se* (count IV); defamation *per quod* (count V); tortious

interference with a business relationship (count VI), and tortious interference with a business expectancy (count VII).

¶ 15    CBS initially moved for partial summary judgment as to counts I, III, VI, and VII of the complaint. With regard to count I, CBS claimed the plaintiff failed to show that it had intruded upon her seclusion in making the videotape arguing that, as a matter of law: (1) the Stebics' backyard at the time of the taping was not "secluded"; (2) the events occurring in the Stebics' backyard at the time of the taping were not "private"; and (3) in making the tape, the defendant was engaged in an ordinary and lawful newsgathering practice that is not "highly offensive." CBS sought summary judgment as to counts III, VI and VII to the extent those counts arise from CBS's conduct in making the videotape.

¶ 16    The parties submitted the following evidence relating to the motion for partial summary judgment. The Stebic home is in a residential neighborhood, and the backyard, including the pool area, is enclosed by a six-foot-high wooden fence, built to comply with local building laws and also for privacy. There is a sliding door in the back of the home leading out to the pool area. According to the plaintiff, the only place from which the entire pool area is clearly visible is the upstairs bedroom window of the rear neighbors, Reardon and Ahlstrom. The plaintiff further alleges that, as the Reardon/Ahlstrom property was 68 feet or more behind the Stebic house, it would not be possible from that distance to identify individuals located in the Stebics' backyard area with the naked eye, and that a telephoto "zoom" lens would be necessary. The plaintiff offered the testimony of an ophthalmologist, Michael Rosenberg, that it would be impossible for an individual with 20/20 vision to be able to specifically identify an individual standing in the Stebics' backyard when viewing from the distance of the Reardon/Ahlstrom yard.

¶ 17    Photographic and testimonial evidence shows that the Stebic house sits at a lower elevation than all of the surrounding properties and that the back of the property, between the Stebics' backyard and the Reardon/Ahlstrom home, adjoins a large grassy area that is accessible to the public. From the grassy area, the Stebics' sliding door and portions of the area immediately in front of it can be seen clearly. However, two lay witnesses, who later went to the area with the plaintiff, gave testimony that they were unable to discern the plaintiff's identity from that area or from the Reardon/Ahlstrom home. There is also a public sidewalk adjacent to the Stebic house, from which the back of the house is also clearly visible. Because of the lower elevation of the Stebic house and yard, it is possible for people traversing the sidewalk or the grassy area to see over the Stebics' fence and into the pool area. Photographs show that individuals in the backyard can been seen from the Reardon/Ahlstrom kitchen, though not clearly identified.

¶ 18    Following arguments, the trial court granted CBS's motion for partial summary judgment as to count I of the complaint. CBS also filed a motion for summary judgment as to the remaining counts of the complaint. With regard to the false light and defamation claims, CBS argued that the plaintiff is a "public figure," and that she therefore was required to prove, by clear and convincing evidence, that CBS disseminated its video and news broadcast with actual malice, meaning purposeful or reckless disregard for the truth of its contents.

¶ 19    In support of its contention that the plaintiff is a public figure, CBS relied upon the following evidence, which is substantially undisputed. The plaintiff had worked for NBC for 11 years. Long prior to the alleged defamation, the plaintiff was by her own admission a well-known journalist, highly regarded in the news industry as an aggressive reporter who broke stories others could not. She was one of the lead reporters at NBC and was typically the

one assigned to cover the important stories. On a national level, her complaint asserted that her "[f]our Emmys in four years showed industry wide recognition of her talent." The plaintiff's professional agent, Todd Mussberger, characterized her as a "very prominent" individual, with great name recognition, being sought after by the national news media. Her professional as well as personal life was covered in various local media, tracking events such as the renewal of her contract with WMAQ, her engagement, her pregnancy and return from maternity leave, her thirtieth birthday party and her assignment to cover the 2002 winter Olympics. The plaintiff "eagerly capitalized" on her notoriety, by being a featured guest at local fundraising events, including sharing top billing with the governor at a gala, appearing on parade floats, and headlining events such as "Dancing with Chicago Celebrities."

¶ 20     The disappearance of Lisa Stebic was described as a "huge" story, becoming the focus of pervasive media coverage at both the local and national levels. There were vigils and fundraisers in support of Lisa, as well as ongoing large public searches for her, all of which were the subject of nearly nightly news. A large, organized public search was scheduled for July 7, 2007, the morning after the plaintiff was videotaped at the Stebic house. Testimony established that, in the months after the disappearance, the media remained present in front of the Stebics' house around the clock, and there were reporters at his door seeking interviews on a constant basis. There was also evidence, apparently undisputed by the plaintiff, that local police maintained nearly constant surveillance of the Stebic house. News reports observed that, on the date of Lisa's disappearance, she was seeking his eviction from the Stebic home. On July 12, 2007, the police named Stebic a "person of interest" in Lisa's disappearance.

¶ 21     The plaintiff was assigned to the Stebic case immediately after Lisa's disappearance and described herself as the "owner" of the story. She testified that she conducted her investigation in the same manner as with all her stories; contacting and exploring potential sources, and cultivating relationships with some sources. She testified that it was typical for her to spend time with the people surrounding her stories, routinely traveling to the site of the story and remaining there until the matters were resolved.

¶ 22     After being assigned to the Stebic case, the plaintiff quickly developed a cordial but professional relationship with the families of Lisa and Craig Stebic, becoming one of the favorite journalists of both families. The plaintiff was frequently at the site of the Stebic home and interviewed Craig several times outside of his home. She also was allowed inside the home on at least five occasions, and she spoke with him frequently by telephone. The plaintiff engaged in "tireless efforts" to determine what happened to Lisa, including participating in a search for Lisa on her day off, and also bringing her boys to a pancake breakfast benefiting Lisa held by Lisa's relatives.

¶ 23     The plaintiff alleged that she was highly respected by the local law enforcement authorities, and testified that she communicated with the police regarding details of the case, and ultimately broke most of the major stories in the case. The plaintiff also testified that, although, from the early days of the investigation, Stebic declined to talk to the police on the advice of his attorneys, he did discuss the case with her. She was the one to inform Stebic that he had been named a person of interest.

¶ 24     The trial court granted CBS's motion for summary judgment, concluding that the plaintiff was a public figure but that she failed to meet her burden of creating a triable issue of fact that, in broadcasting the alleged defamatory report, CBS acted with actual malice. The court further

found that the remaining counts of the complaint were derivative of her defamation claim, granting summary judgment as to those counts. The instant appeal followed.

¶ 25   The plaintiff first argues that the trial court erred in granting summary judgment as to her defamation claims. Summary judgment should be granted where the pleadings, depositions, admissions, and affidavits on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008); *Farmers Automobile Insurance Ass'n v. Williams*, 321 Ill. App. 3d 310, 314 (2001). In determining whether a genuine issue of material fact exists, we construe the evidence in the record strictly against the movant and liberally in favor of the opponent. *Adams v. Northern Illinois Gas Co*., 211 Ill. 2d 32, 43 (2004). We review the trial court's allowance of summary judgment *de novo*. *Ioerger v. Halverson Construction Co*., 232 Ill. 2d 196, 201 (2008).

¶ 26   The plaintiff argues that the court erred in finding that she was a public figure under defamation law, and that she was therefore required to prove that CBS acted with actual malice in preparing and releasing the videotape. In order to prevail on a claim for defamation, a plaintiff must show that the alleged defamatory expression was somehow exempt from the broad first amendment protection of free speech and free press. See *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 393-94 (2008). In general, where the allegedly defamed person is a private individual, she need only demonstrate that the defendant was negligent in its publication of the alleged defamatory falsehood. *Id*. Where the plaintiff is found to be a public figure, however, she must prove, by clear and convincing evidence, that the defendant acted with "actual malice" in making the defamatory expression. See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Kessler v. Zekman*, 250 Ill. App. 3d 172 (1993). In *Gertz*, the Court held that the applicability of the actual malice standard turns not so much upon the content of the expression or its value as a matter of public interest, but instead upon whether the plaintiff, through his voluntary conduct, has assumed a role of "especial prominence in the affairs of society" so as to "invite attention and comment" upon his actions. *Gertz*, 418 U.S. at 345; *Kessler*, 250 Ill. App. 3d at 180. The imposition of this heightened burden is justified, the Court reasoned, because public individuals not only have placed themselves in a position inviting commentary and scrutiny, but also have significantly greater access to channels of effective communication, thus providing a more realistic opportunity to counteract false statements and rectify any damage to their reputation. *Gertz*, 418 U.S. at 344.

¶ 27   *Gertz* went on to classify two types of public figures. The first, known as a general purpose public figure, includes individuals who have achieved "such pervasive fame or notoriety" that they "become[ ] a public figure for all purposes and in all contexts." *Id*. at 351. Designation in this category is not lightly given; it should not be premised merely upon some degree of participation in community or professional affairs. See *id*. at 352. Rather, the defamation defendant who claims that the plaintiff is an all purpose public figure must provide "clear evidence" of the plaintiff's "general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Id.*

¶ 28   More commonly, the public-figure determination should fall into the second classification, that of the "limited purpose" public figure, which turns upon the nature and extent of the individual's participation in the controversy that led to the defamation. *Id*. at 351-52. Specifically, where individuals "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," they become public figures for the limited range of issues associated with those controversies. *Id*. at 345, 351;

*Wayment v. Clear Channel Broadcasting, Inc.*, 2005 UT 25, ¶ 22, 116 P.3d 271. The question of whether a defamation plaintiff is a public figure is one of law and, therefore, subject to *de novo* review. See *Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966); *Kessler*, 250 Ill. App. 3d at 182.

¶ 29  We are unable to conclude that the plaintiff in this case, though indisputably a well-known Chicago reporter, rose to the level of a general purpose public figure under the strictures of *Gertz*. In *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980), *cert. denied*, 449 U.S. 898 (1980), a case which this court has recognized as a seminal authority in the application of *Gertz* (see *Kessler*, 250 Ill. App. 3d at 181), the court concluded that such classification should be reserved only for a well-known celebrity, or an individual whose name has reached the status of a " 'household word.' " *Waldbaum*, 627 F.2d at 1294. In general, journalists and television reporters, even those having attained local notoriety, have not been held to be general purpose public figures, but rather limited purpose figures. See *Wayment*, 2005 UT 25, ¶ 29 (collecting cases). A defendant seeking to classify the plaintiff as a general purpose figure should furnish proof of the plaintiff's pervasive influence and name recognition, or evidence demonstrating that others have altered or reevaluated their conduct or ideas in light of the plaintiff's actions. *Id.* ¶ 25. The court in *Waldbaum* reasoned that truly famous figures " 'may be able to transfer their recognition and influence from one field to another,' " and that " '[a] person's power to capitalize on his general fame by lending his name to products, candidates, and causes' " will indicate the broad influence he has. *Wayment*, 2005 UT 25, ¶ 22 (quoting *Waldbaum*, 627 F.2d at 1294 n.15).

¶ 30  In this case, CBS relied upon proof that the plaintiff had won four Emmy awards in four years, was a well-known personality in Chicago and in local journalistic circles, and had some professional community involvement. Such recognition and involvement, however, falls short of the "pervasive fame" or broad societal influence commanded by general purpose public figures under *Gertz* and *Waldbaum*. In fact, as in *Wayment*, the facts in this case portray the plaintiff as an individual performing her job as a reporter, placing herself in the public eye as a means to attract viewers to her station. See *id.* ¶ 27.

¶ 31  We do find, however, that the plaintiff constituted a public figure under the second classification. In determining whether an individual may qualify as a limited public figure, Illinois has adopted the three-part test articulated in *Waldbaum*. See *Kessler*, 250 Ill. App. 3d at 181. First, there must be a public controversy, which means an issue that is being debated publicly, the outcome of which impacts the general public or some portion of it in an appreciable way. *Waldbaum*, 627 F.2d at 1296. A matter of general public interest or concern is not sufficient. *Id.*; *Della-Donna v. Gore Newspapers Co.*, 489 So. 2d 72, 77 (Fla. Dist. Ct. App. 1986). Second, the plaintiff must have undertaken some voluntary act seeking to influence the resolution of the issues involved. *Waldbaum*, 627 F.2d at 1297; *Wayment*, 2005 UT 25, ¶ 31 n.12. And "[f]inally, the alleged defamation must have been germane to plaintiff's participation in the controversy." *Kessler*, 250 Ill. App. 3d at 182 (quoting *Waldbaum*, 627 F.2d at 1298).

¶ 32  Here, the evidence shows that the disappearance of Lisa, and the question of Stebic's involvement in it, was a matter of public controversy. Characterized by various media sources as a "huge" and ubiquitous story, the case was the focus of nightly news coverage, both nationally and locally. The plaintiff does not substantively contest CBS's evidence that large segments of the public, at least locally, were following the developing investigation into Lisa's

whereabouts, discussing the couple's contentious divorce and the location and care of their children, and debating Craig Stebic's character and potential designation as a suspect. Testimony established that, in the months following the disappearance, the media maintained a pervasive presence in the area of the Stebic house, with reporters "constantly" at the door seeking interviews. It is apparent that these issues, tying into the overriding topical question of domestic violence, went beyond mere public interest, and had reached the level of public controversy.

¶ 33    There can further be no dispute that the plaintiff inserted herself into a prominent position in the controversy. Already a well-known local personality and high-profile reporter, the plaintiff worked steadfastly to become the "owner" of the Stebic story, admittedly throwing herself into the case, frequenting the site of the Stebic home with a camera crew, participating in public vigils and searches with a camera crew, or, at times on her days off, urging the public to come forward with any clues shedding light on Lisa's disappearance. She also solicited and achieved close professional relationships with the families of both Lisa and Craig, gaining unique access to the story as one of these families' "favorite journalists." She admittedly worked "tirelessly" in the ongoing efforts to find Lisa. She was highly respected by the local law enforcement authorities and testified that she communicated with the police regarding the case and ultimately broke most of the major stories in the case of Lisa's disappearance. The plaintiff also testified that, although Craig Stebic had declined to speak with the police by the second week after the disappearance, he did discuss the case with her.

¶ 34    It was the plaintiff's existing notoriety, combined with her access to the Stebic family and her tenacious aspiration to "get to the bottom" of the case, that thrust her even further into the public spotlight, invited scrutiny of her methods, and gave rise to the ethical predicament in which she found herself on July 7. See *Della-Donna*, 489 So. 2d 72. Further, it cannot be disputed that her conduct in going to the Stebics' that day was germane to the controversy. As became clear soon after the reports surfaced in the *Chicago Tribune* and the *Sun Times*, the plaintiff's coverage of the Stebic case created widespread public outcry and debate as to her journalistic ethics and judgment. Evidence in the record in the form of public correspondence to NBC, as well as media commentary, demonstrates that her actions affected the way the public perceived her reporting on the Stebic story, as well as generally. See *Kessler*, 250 Ill. App. 3d at 182. Finally, as a public figure, she could and did avail herself of effective communication channels to explain her side of the story, choosing from an onslaught of media outlets which were pursuing her, and finding the ones that would best help her to clear her name. See *Gertz*, 418 U.S. at 344. Accordingly, we conclude that CBS's report of the plaintiff's actions was of the type contemplated under the first amendment and *Gertz*.

¶ 35    Next, the plaintiff contends that, even if she is a public figure, she has set forth sufficient evidence to prove that CBS acted with "actual malice" when preparing and editing the videotape.

¶ 36    In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986), the Court held that in order to defeat a motion for summary judgment in a libel case, a public-figure plaintiff must show that the evidence, viewed in the light most favorable to plaintiff, is such that a reasonable jury might find that actual malice had been shown with "convincing clarity." Accord *Catalano v. Pechous*, 83 Ill. 2d 146, 170 (1980). Under the actual malice standard, a defamation defendant escapes liability unless the plaintiff proves that the defendant published the defamatory falsehood either with knowledge that it was false, or with a reckless disregard of whether it was

false or not. *Gertz*, 418 U.S. at 327-28; *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Reckless disregard means that the defendant had a "high degree of awareness" that the statement was probably false (*Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)), or "entertain[ed] serious doubts as to its truth." (Internal quotation marks omitted.) *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 24-25 (1993); accord *Coghlan v. Beck*, 2013 IL App (1st) 120891. Consistent with this standard, where a plaintiff contends that the defamatory expression was implied from a context, rather than stated directly, she is required to establish that the defendant was subjectively aware of the implied meaning, or at least recklessly disregarded the potential for such implication. *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988); *Woods v. Evansville Press Co.*, 791 F.2d 480 (7th Cir. 1986).

¶ 37 In support of a showing of actual malice, the plaintiff alleges that, in preparing the video, CBS was motivated by that fact that it was trailing NBC in a bitter ratings battle and that Puccinelli himself harbored a competitive ill will against the plaintiff after being denied an interview at the Stebic home on the same morning the plaintiff was invited to the pool. The plaintiff's agent Mussberger gave the following opinion as to CBS's motives:

"They ran it for prurient interest….By placing [Stebic]–the juxtaposition of that guy and [the plaintiff] gave rise to–every television viewer that saw it had to go away thinking that she was carrying on with that guy while she was supposed to be covering a story. Impossible to come back from that."

¶ 38 Last, she points to one line from an email from Fowler to Puccinelli following the occurrence, in which Fowler states, after reviewing a proposed interview obtained by Puccinelli on the Stebic case: "Mike–This is great. I think we need to stay on this story in a big way and now that [the plaintiff] is out of the way you have the best opportunity now to own it."

¶ 39 The plaintiff also relies upon the tape itself, claiming that the editing and the images displayed were clearly chosen by CBS "to achieve the ultimate defamatory sexual message."[1] In particular, she claims that, only seconds after she is shown in her swimsuit and towel, the camera cuts to Stebic putting on his shirt, while in the raw footage, these two events actually occurred minutes apart. She also notes that, while Jill appears clearly in the raw footage, she is left out of the final version. Finally, the plaintiff cites to evidence of public outrage following the broadcast, and testimony by Fowler admitting that, after viewing the videotape, the general public could perceive that an "illicit" or "improper" relationship was going on between the plaintiff and Stebic.

¶ 40 In response, CBS relies upon testimony from its employees, all central either to the airing of the broadcast or its preparation, uniformly denying that the broadcast was intended to convey or imply that the plaintiff was using sex as a means to get a story. Editor John Petrosky was presented with the full video footage and a copy of the broadcast script, and given

---

[1] In support of her argument, the plaintiff relies heavily on an alleged holding by the trial court in the context of CBS's motion to dismiss a prior version of her complaint. According to the plaintiff, the court concluded there that the videotape was "capable of *only* a defamatory meaning *** namely, that [the plaintiff] used 'adultery' and 'seductive means' to cultivate sources and get her stories." (Emphasis in original.) This was not the statement of the trial court. In fact, the court appropriately held, for purposes of ruling on a motion to dismiss, that the videotape and broadcast were reasonably capable of *a* defamatory construction, not exclusively a sexual one.

otherwise complete discretion as to its editing. In his deposition, Petrosky denied any understanding that the script implied a sexual or even unprofessional relationship. Instead, he believed it suggested that the "manner in which [the plaintiff] conducted herself was unprofessional," meaning that she was "in the backyard of a news source *** in a story involving a missing woman *** dressed in a bikini *** [with] her children." Similarly, Guillen, who prepared the script for her broadcast, denied implying anything sexual when she referred to the plaintiff's "technique in pursuing a source," but indicated that she was simply questioning events as seen on the video. Finally, CBS employees denied any belief that the plaintiff and Stebic were engaged in a sexual relationship.

¶ 41 We agree with the trial court, that, of course, CBS cannot escape liability simply by claiming that it had no knowledge that the content of the video may have been false. However, it still remains for the plaintiff to present actual evidence, sufficient to create a genuine issue of material fact, that such subjective knowledge existed. She has failed in this regard.

¶ 42 First, it is well established that, the fact that the parties were engaged in a ratings battle and were fierce competitors is alone not enough. The defendant must be shown to have "coupled his rancor *** with a knowledge of the falsity of the statement complained of, or a reckless disregard as to its truth or falsity." *Kessler*, 250 Ill. App. 3d at 190; see also *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666-67 (1989) (demonstrated hostility toward plaintiff insufficient). Our review of the unrebutted testimony of CBS employees reveals no basis to conclude that, in videotaping and reporting upon the plaintiff's presence at the Stebic house, CBS intended to convey that she was engaged in a sexual relationship with Craig Stebic.

¶ 43 Although the broadcast footage may be viewed by some as connoting a sexual relationship, this is certainly not the only permissible interpretation. This is especially so in light of the fact that the plaintiff's children are depicted near the sliding door where she was shown. The mere fact that a statement is capable of one defamatory inference does not mean that that inference is the only one that can be drawn, nor does it mean the statement's publisher "either intended the statement to contain such a defamatory implication or even knew that the readers could reasonably interpret the statement[ ] to contain the defamatory implication." *Saenz*, 841 F.2d at 1318 (citing *Woods*, 791 F.2d at 487). In fact, it can be said that the images of Craig Stebic and the plaintiff, who were clearly shot at different locations of the pool area, were warranted in order to convey the gist of the report, that the plaintiff was swimming at the pool of Craig Stebic. Finally, while the plaintiff takes much from the fact that Jill Webb was edited out of the final tape, we find this of little significance where Guillen stated in the broadcast that Webb was also at the home. Further, although the record contains emails reflecting disapproval of CBS's coverage of the issue, it also includes testimonials to the public's disappointment in the plaintiff's manner of reporting and disillusionment with her choices as a journalist. Viewed in its proper context, the plaintiff's evidence fails to create a triable issue that, when CBS edited and broadcast the videotape, it did so with the intent to publish a false report about the plaintiff, or with a reckless disregard as to the truth of the report.

¶ 44 Based upon the foregoing analysis, we also reject the plaintiff's next contention, that she sufficiently demonstrated actual malice for purposes of her false light claim. See, *e.g.*, *Lane v. Random House, Inc.*, 985 F. Supp. 141, 148 (D.D.C. 1995) (actual malice for false light same standard as defamation).

- 12 -

¶ 45    Next, the plaintiff argues that she sufficiently demonstrated that CBS intruded upon her seclusion, when it filmed her engaging in private activities at a time when she had a reasonable expectation of privacy to be free of such recording. Specifically, CBS filmed her "in her two-piece swimsuit, with her children, while in a private backyard." We disagree.

¶ 46    Shortly after the trial court's decision in this case, our supreme court expressly recognized a right of action in Illinois for violation of the right to privacy based upon intrusion upon seclusion. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 35. The court has cited with approval the Restatement of Torts, which indicates that the core of this action is a "highly offensive prying into the physical boundaries or affairs of another person." *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 416-17 (1989). The tort does not depend upon the publication or publicity itself. *Id.* at 417; see also *Lawlor*, 2012 IL 112530, ¶ 33. The examples forming the basis for the tort include invading an individual's home; an illegal search of his or her shopping bag in a store; eavesdropping by wiretapping; peering into the windows of a private home; and persistent and unwanted telephone calls. *Lovgren*, 126 Ill. 2d at 417 (citing Prosser and Keeton on Torts § 117, at 854-55 (W. Page Keeton at al. eds., 5th ed. 1984)).

¶ 47    The elements required to prove intrusion upon seclusion are (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is highly offensive or objectionable to a reasonable person; (3) that the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering. *Johnson v. K mart Corp.*, 311 Ill. App. 3d 573 (2000). The third element of the tort, requiring allegations of private facts, is the predicate for the other elements, and as such, if this element is not proven, this court need not reach the other elements. *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 440 (2005); *Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 72 (2004).

¶ 48    Our analysis in this case begins and ends with the privacy element. We conclude that (1) the plaintiff cannot reasonably be said to have had a legitimate expectation of privacy or seclusion in the Stebics' backyard, and (2) in addition, the videotape reveals no specific act that could be considered private.

¶ 49    First, although the pool was surrounded by a six-foot fence, the lot lay at the bottom of an incline, which, according to undisputed expert testimony, made the property between three to five feet lower than the surrounding area. This is supported by photographs in the record, in which the sliding door leading into the pool area can be seen clearly over the fence from the Reardon/Ahlstrom ground floor. Our review of the record and the evidence substantiates the trial court's finding that, given the layout of the property and the surrounding area, the videotape could just as easily have been shot from the public sidewalk or the grassy area behind the Stebics' property, the latter of which is even closer in distance than the Reardon/Ahlstrom home. See *Schiller*, 357 Ill. App. 3d at 441.

¶ 50    The expectation of privacy was further diminished by the fact that the video was of the backyard of Craig Stebic, who was at that time subject to observation not only by law enforcement, but by the media, which the evidence showed maintained a near constant presence around his house. Although the plaintiff contended she was unaware of any media presence in the area when she arrived that morning, she admitted learning that day that there were, in fact, television and camera crews in the neighborhood preparing for the search the following day, and that Puccinelli had come to the Stebics' door seeking an interview. Under all of these circumstances, it cannot reasonably be said that the plaintiff, as an experienced

reporter, as well as a lead reporter on the Stebic story, expected that she would find seclusion on the readily visible property outside of their home.

¶ 51 The plaintiff makes much of the fact that a "zoom" lens was required to properly identify who she was. Assuming that a zoom lens was used here, the plaintiff fails to cite an Illinois case showing how this could be dispositive under the circumstances of this case. Further, her argument seems disingenuous given the fact that her car was parked in front of the Stebic house at the time the video was shot. This fact also helped CBS confirm that she was present in the yard.

¶ 52 Finally, there is nothing shown in the videotape that is especially private. The plaintiff is shot from a distance, has a towel around her waist, and is seen primarily walking around talking on her cell phone. Her children are briefly shown, but their images similarly aren't entirely clear. Accordingly, we find no error in the dismissal of this issue on summary judgment.

¶ 53 Last, the plaintiff argues that the court erred in granting summary judgment on her claims of emotional distress and intentional interference with prospective business relations, on the basis that they were derivative of the already rejected defamation and invasion of privacy claims. She argues that those claims did not turn simply upon the content of the videotape, but upon CBS's "entire process" of "filming and editing *** that video clip."

¶ 54 In light of the fact that the plaintiff's actions for defamation, false light, and invasion of privacy have been rejected, those actions can no longer serve as a basis for her claims of intentional infliction of emotional distress or tortious interference with a business expectation. See *Harte-Hanks*, 491 U.S. at 667 (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)); *Imperial Apparel*, 227 Ill. 2d at 402. Instead, she must plead and prove the elements of those torts independently of any alleged defamatory conduct by CBS or any conduct amounting merely to an invasion of her privacy.

¶ 55 It is difficult to pinpoint the plaintiff's shifting theory of liability with regard to these claims. We agree with CBS that, before the trial court, the plaintiff alternatively argued that the claims are "all predicated on the *editing and broadcasting* of the video" (emphasis added), and then, after conceding that claims related to the broadcasting were merely derivative of the defamation action, argued that her claims are related to the "filming and editing" of the clip.

¶ 56 In any event, a review of the plaintiff's complaint and response to the summary judgment motion fails to reveal exactly what actions by CBS in filming and editing are forming the basis of her remaining claims. If her theories are in fact related to the alleged defamatory broadcast, she has already conceded that they are merely derivative. To the extent she alleges that the filming of her "at the Stebic home, with her children, in a two piece swimsuit" was a "highly offensive" "intrusion" causing her emotional distress, this claim has been rejected.

¶ 57 For the foregoing reasons, we affirm the decisions of the circuit court granting summary judgment in favor of CBS.

¶ 58 Affirmed.